(Slip Opinion)          OCTOBER TERM, 2015          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## STURGEON *v.* FROST, ALASKA REGIONAL DIRECTOR OF THE NATIONAL PARK SERVICE, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 14–1209.  Argued January 20, 2016—Decided March 22, 2016

The Alaska National Interest Lands Conservation Act (ANILCA) set aside 104 million acres of land in Alaska for preservation purposes. Under ANILCA, those lands were placed into "conservation system units," which were defined to include "any unit in Alaska of the National Park System, National Wildlife Refuge System, National Wild and Scenic Rivers Systems, National Trails System, National Wilderness Preservation System, or a National Forest Monument." 16 U. S. C. §3102(4).  In addition to federal land, over 18 million acres of state, Native Corporation, and private land were also included within the boundaries of those conservation system units.

In 2007, John Sturgeon was piloting his hovercraft over a stretch of the Nation River that flows through the Yukon-Charley Rivers National Preserve, a conservation system unit in Alaska that is managed by the National Park Service.  Alaska law permits the use of hovercraft.  National Park Service regulations do not.  See 36 CFR §2.17(e).  Park Service rangers approached Sturgeon, informing him that hovercraft were prohibited within the preserve under Park Service regulations.  Sturgeon protested that Park Service regulations did not apply because the river was owned by the State of Alaska. The rangers ordered Sturgeon to remove his hovercraft from the preserve, and he complied.  Sturgeon later filed suit against the Park Service in the United States District Court for the District of Alaska, seeking declaratory and injunctive relief permitting him to operate his hovercraft within the boundaries of the Yukon-Charley.  Alaska intervened in support of Sturgeon.

The Secretary of the Interior has authority to "prescribe regulations" concerning "boating and other activities on or relating to water

located within System units." 54 U. S. C. §100751(b). The Park Service's hovercraft regulation was adopted pursuant to Section 100751(b). The hovercraft ban is not limited to Alaska, but instead has effect in federally managed preservation areas across the country. Section 103(c) of ANILCA, in contrast, addresses the scope of the Park Service's authority over lands within the boundaries of conservation system units in Alaska. The first sentence of Section 103(c) specifies the property included as a portion of those units. It states: "Only those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit." 16 U. S. C. §3103(c). ANILCA defines the word "land" to include "lands, waters, and interests therein," and the term "public lands" to include lands to which the United States has "title," with certain exceptions. §3102.

The second sentence of Section 103(c) concerns the Park Service's authority to regulate "non-public" lands in Alaska, which include state, Native Corporation, and private property. It provides: "No lands which, before, on, or after December 2, 1980, are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units." §3103(c). The third sentence of Section 103(c) explains how new lands become part of conservation system units: "If the State, a Native Corporation, or other owner desires to convey any such lands, the Secretary may acquire such lands in accordance with applicable law (including this Act), and any such lands shall become part of the unit, and be administered accordingly." *Ibid.*

Interpreting Section 103(c) of ANILCA, the District Court granted summary judgment to the Park Service, and the Ninth Circuit affirmed in pertinent part. According to the Ninth Circuit, because the hovercraft regulation "applies to all federal-owned lands and waters administered by [the Park Service] nationwide, as well as all navigable waters lying within national parks," the hovercraft ban does not apply "solely" within conservation system units in Alaska. 768 F. 3d 1066, 1077. The Ninth Circuit concluded that the Park Service therefore has authority to enforce its hovercraft regulation on the Nation River. The Ninth Circuit did not address whether the Nation River counts as "public land" for purposes of ANILCA.

*Held*: The Ninth Circuit's interpretation of Section 103(c) is inconsistent with both the text and context of ANILCA. Pp. 12–16.

    (a) The Ninth Circuit's interpretation of Section 103(c) violates "a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Roberts* v. *Sea-Land Services, Inc.*, 566 U. S. ___, ___. ANILCA repeatedly recognizes that Alaska is differ-

Syllabus

ent, and ANILCA itself accordingly carves out numerous Alaska-specific exceptions to the Park Service's general authority over federally managed preservation areas. Those Alaska-specific provisions reflect the simple truth that Alaska is often the exception, not the rule. Yet the reading below would prevent the Park Service from recognizing Alaska's unique conditions. Under that reading, the Park Service could regulate "non-public" lands in Alaska only through rules applicable outside Alaska as well. The Court concludes that, whatever the reach of the Park Service's authority under ANILCA, Section 103(c) did not adopt such a "topsy-turvy" approach. Pp. 12–14.

(b) Moreover, it is clear that Section 103(c) draws a distinction between "public" and "non-public" lands within the boundaries of conservation system units in Alaska. And yet, according to the court below, if the Park Service wanted to differentiate between that "public" and "non-public" land in an Alaska-specific way, it would have to regulate the "non-public" land pursuant to rules applicable outside Alaska, and the "public" land pursuant to Alaska-specific provisions. Assuming the Park Service has authority over "non-public" land in Alaska (an issue the Court does not decide), the Court concludes that this is an implausible reading of the statute. The Court therefore rejects the interpretation of Section 103(c) adopted by the court below. Pp. 14–15.

(c) The Court does not reach the remainder of the parties' arguments. In particular, it does not decide whether the Nation River qualifies as "public land" for purposes of ANILCA. It also does not decide whether the Park Service has authority under Section 100751(b) to regulate Sturgeon's activities on the Nation River, even if the river is not "public" land, or whether—as Sturgeon argues—any such authority is limited by ANILCA. Finally, the Court does not consider whether the Park Service has authority under ANILCA over both "public" and "non-public" lands within the boundaries of conservation system units in Alaska, to the extent a regulation is written to apply specifically to both types of land. The Court leaves those arguments to the lower courts for consideration as necessary. Pp. 15–16.

768 F. 3d 1066, vacated and remanded.

ROBERTS, C. J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–1209

_____

JOHN STURGEON, PETITIONER *v.* BERT FROST, IN HIS OFFICIAL CAPACITY AS ALASKA REGIONAL DIRECTOR OF THE NATIONAL PARK SERVICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 22, 2016]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

For almost 40 years, John Sturgeon has hunted moose along the Nation River in Alaska. Because parts of the river are shallow and difficult to navigate, Sturgeon travels by hovercraft, an amphibious vehicle capable of gliding over land and water. To reach his preferred hunting grounds, Sturgeon must pilot his hovercraft over a stretch of the Nation River that flows through the Yukon-Charley Rivers National Preserve, a 1.7 million acre federal preservation area managed by the National Park Service. 16 U. S. C. §410hh(10).

Alaska law permits the use of hovercraft. National Park Service regulations do not. See 36 CFR §2.17(e) (2015). After Park Service rangers informed Sturgeon that he was prohibited from using his hovercraft within the boundaries of the preserve, Sturgeon filed suit, seeking declaratory and injunctive relief. He argues that the Nation River is owned by the State, and that the Alaska National Interest

Lands Conservation Act (ANILCA) prohibits the Park Service from enforcing its regulations on state-owned land in Alaska. The Park Service disagrees, contending that it has authority to regulate waters flowing through federally managed preservation areas. The District Court and the Court of Appeals ruled in favor of the Park Service. We granted certiorari.

I

In 1867, Secretary of State William Seward, serving under President Andrew Johnson, negotiated a treaty to purchase Alaska from Russia for $7.2 million. Treaty Concerning the Cession of the Russian Possessions in North America, Mar. 30, 1867, 15 Stat. 539. In a single stroke, the United States gained 365 million acres of land—an area more than twice the size of Texas. Despite the bargain price of two cents an acre, however, the purchase was mocked by contemporaries as "Seward's Folly" and President Johnson's "Polar Bear Garden." See C. Naske & H. Slotnick, Alaska: A History 92–94 (2011) (Naske & Slotnick); S. Rep. No. 1163, 85th Cong., 1st Sess., 2 (1957).

The monikers didn't stick. In 1898, the "Three Lucky Swedes"—Jafet Lindeberg, Eric Lindblom, and Jon Brynteson—struck gold in Nome, Alaska. As word of their discovery spread, thousands traveled to Alaska to try their hand at mining. Once the gold rush subsided, settlers turned to other types of mining, fishing, and trapping, fueling an emerging export economy. See Naske & Slotnick 128–129, 155, 249–251; D. Wharton, The Alaska Gold Rush 186–187 (1972).

Despite newfound recognition of Alaska's economic potential, however, it was not until the 1950's that Congress seriously considered admitting Alaska as a State. By that time, it was clear that Alaska was strategically important both in the Pacific and Arctic, and that the

Territory was rich in natural resources, including oil. Moreover, the people of Alaska favored statehood. See Naske & Slotnick 201, 224–235. But there was a problem: Out of the 365 million acres of land in Alaska, 98 percent were owned by the Federal Government. As a result, absent a land grant from the Federal Government to the State, there would be little land available to drive private economic activity and contribute to the state tax base. See S. Rep. No. 1163, at 2, 12 ("The expenses of the State of Alaska will be comparatively high, partially due to the vast land areas within the State; but the State would be able to realize revenues from only 2 percent of this vast area unless some provision were made to modify the present land-ownership conditions").

A solution was struck. The 1958 Alaska Statehood Act permitted Alaska to select 103 million acres of "vacant, unappropriated, and unreserved" federal land—just over a quarter of all land in Alaska—for state ownership. §§6(a)–(b), 72 Stat. 340. That land grant included "mineral deposits," which were "subject to lease by the State as the State legislature may direct." §6(i), *id.*, at 342. Upon statehood, Alaska also gained "title to and ownership of the lands beneath navigable waters" within the State, in addition to "the natural resources within such lands and waters," including "the right and power to manage, administer, lease, develop, and use the said lands and natural resources." §3(a), 67 Stat. 30, 43 U. S. C. §1311(a); §6(m), 72 Stat. 343. With over 100 million acres of land now available to the new State, Alaska could begin to fulfill its state policy "to encourage the settlement of its land and the development of its resources by making them available for maximum use consistent with the public interest." Alaska Const., Art. VIII, §1 (2014).

The Statehood Act did not, however, determine the rights of the Alaska Natives, who asserted aboriginal title to much of the same land now claimed by the State.

Naske & Slotnick 287–289.  To resolve the dispute, Congress in 1971 passed the Alaska Native Claims Settlement Act (ANCSA), which extinguished aboriginal land claims in Alaska.  85 Stat. 688, as amended, 43 U. S. C. §1601 *et seq.*  In exchange, Congress provided for a $960 million settlement and permitted corporations organized by groups of Alaska Natives to select 40 million acres of federal land to manage within the State.  §§1605, 1610–1615; Naske & Slotnick 296–297.  Congress sought to implement the settlement "rapidly, with certainty, in conformity with the real economic and social needs" of Alaska Natives.  §1601(b).

In addition to settling the claims of the Alaska Natives, ANCSA directed the Secretary of the Interior to select up to 80 million acres of unreserved federal land in Alaska for addition to the National Park, Forest, Wildlife Refuge, and Wild and Scenic Rivers Systems, subject to congressional approval.  §1616(d)(2).  When Congress failed to approve the Secretary's selections, however, President Carter unilaterally designated 56 million acres of federal land in Alaska as national monuments.  See Presidential Proclamation Nos. 4611–4627, 3 CFR 69–104 (1978 Comp.).

President Carter's actions were unpopular among many Alaskans, who were concerned that the new monuments would be subject to restrictive federal regulations.  Protesters demonstrated in Fairbanks, and more than 2,500 Alaskans participated in the "Great Denali-McKinley Trespass."  The goal of the trespass was to break over 25 Park Service rules in a two-day period—including by camping, hunting, snowmobiling, setting campfires, shooting guns, and unleashing dogs.  During the event, a "rider on horseback, acting the part of Paul Revere, galloped through the crowd yelling, 'The Feds are coming!  The Feds are coming!'"  N. Y. Times, Jan. 15, 1979, p. A8; Anchorage Daily News, Jan. 15, 1979, pp. 1–2.

Congress once again stepped in to settle the controversy,

passing the Alaska National Interest Lands Conservation
Act. 94 Stat. 2371, 16 U. S. C. §3101 *et seq.* ANILCA had
two stated goals: First, to provide "sufficient protection for
the national interest in the scenic, natural, cultural and
environmental values on the public lands in Alaska."
§3101(d). And second, to provide "adequate opportunity
for satisfaction of the economic and social needs of the
State of Alaska and its people." *Ibid.*

ANILCA set aside 104 million acres of land in Alaska for
preservation purposes, in the process creating ten new
national parks, preserves, and monuments—including the
Yukon-Charley Rivers National Preserve—and tripling
the number of acres set aside in the United States for
federal wilderness preservation. See §410hh; Naske &
Slotnick 315–316. At the same time, ANILCA specified
that the Park Service could not prohibit on those lands
certain activities of particular importance to Alaskans.
See, *e.g.,* §3170(a) (Secretary must permit reasonable use
of vehicles "for travel to and from villages and homesites");
§3201 (Secretary must permit "the taking of fish and
wildlife for sport purposes and subsistence uses" within
National Preserves in Alaska, subject to regulation and
certain exceptions). President Carter's earlier land desig-
nations were rescinded. See §3209(a).

Under ANILCA, federal preservation lands in Alaska
were placed into "conservation system units," which were
defined to include "any unit in Alaska of the National
Park System, National Wildlife Refuge System, National
Wild and Scenic Rivers Systems, National Trails System,
National Wilderness Preservation System, or a National
Forest Monument." §3102(4). Congress drew the bound-
aries of those units to "follow hydrographic divides or em-
brace other topographic or natural features," however,
rather than to map the Federal Government's landhold-
ings. §3103(b). As a consequence, in addition to federal
land, over 18 million acres of state, Native Corporation,

and private land ended up inside the boundaries of conservation system units. See Brief for Petitioner 6.

This brings us back to Sturgeon and his hovercraft.

## II
## A

One fall day in 2007, Sturgeon was piloting his hovercraft on the Nation River, which rises in the Ogilvie Mountains in Canada and joins the Yukon River within the boundaries of the Yukon-Charley Rivers National Preserve conservation system unit (Yukon-Charley). Sturgeon was headed to a hunting ground upstream from the preserve, just shy of the Canadian border. To reach that hunting ground, dubbed "moose meadows," Sturgeon had to travel on a portion of the river that flows through the preserve.

About two miles into his trip on the Nation River, Sturgeon stopped on a gravel bar to repair the steering cable of his hovercraft. As he was performing the repairs, Sturgeon was approached by three Park Service rangers. The rangers informed him that hovercraft were prohibited under Park Service regulations, and that he was committing a crime by operating his hovercraft within the boundaries of the Yukon-Charley. Despite Sturgeon's protests that Park Service regulations did not apply because the river was owned by the State of Alaska, the rangers ordered Sturgeon to remove his hovercraft from the preserve. Sturgeon complied, heading home without a moose.

Sturgeon now fears that he will be criminally prosecuted if he returns to hunt along the Nation River in his hovercraft. To avoid prosecution, Sturgeon sued the Park Service and several federal officials in the United States District Court for the District of Alaska. He seeks declaratory and injunctive relief permitting him to operate his hovercraft within the boundaries of the Yukon-Charley. Alaska intervened in support of Sturgeon, and the Park

Service opposed the suit.

The District Court granted summary judgment to the Park Service. *Sturgeon* v. *Masica*, 2013 WL 5888230 (Oct. 30, 2013). The Court of Appeals for the Ninth Circuit affirmed in pertinent part. *Sturgeon* v. *Masica*, 768 F. 3d 1066 (2014).

We granted certiorari. 576 U. S. \_\_\_ (2015).

B

The Secretary of the Interior has authority to "prescribe regulations" concerning "boating and other activities on or relating to water located within System units, including water subject to the jurisdiction of the United States." 54 U. S. C. §100751(b) (2012 ed., Supp. II). "System units" are in turn defined as "any area of land and water administered by the Secretary, acting through the Director [of the Park Service], for park, monument, historic, parkway, recreational, or other purposes." §§100102, 100501.

The Park Service's hovercraft regulation was adopted pursuant to Section 100751(b). The hovercraft ban applies not only within "[t]he boundaries of federally owned lands and waters administered by the National Park Service," but also to "[w]aters subject to the jurisdiction of the United States located within the boundaries of the National Park System, including navigable waters . . . without regard to the ownership of submerged lands." 36 CFR §1.2(a). The hovercraft ban is not limited to Alaska, but instead has effect in federally managed preservation areas across the country.

Section 103(c) of ANILCA, in contrast, addresses the scope of the Park Service's authority over lands within the boundaries of conservation system units in Alaska. The first sentence of Section 103(c) specifies the property included as a portion of those units. It states: "Only those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this

Act) shall be deemed to be included as a portion of such unit." 16 U. S. C. §3103(c). ANILCA defines the word "land" to include "lands, waters, and interests therein," and the term "public lands" to include "lands the title to which is in the United States after December 2, 1980," with certain exceptions. §3102. In sum, only "lands, waters, and interests therein" to which the United States has "title" are considered "public" land "included as a portion" of the conservation system units in Alaska.

The second sentence of Section 103(c) concerns the Park Service's authority to regulate "non-public" lands in Alaska, which include state, Native Corporation, and private property. It provides: "No lands which, before, on, or after December 2, 1980, are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units." §3103(c).

The third sentence of Section 103(c) explains how new lands become part of conservation system units: "If the State, a Native Corporation, or other owner desires to convey any such lands, the Secretary may acquire such lands in accordance with applicable law (including this Act), and any such lands shall become part of the unit, and be administered accordingly." *Ibid.*

C

The parties dispute whether Section 103(c) of ANILCA created an Alaska-specific exception to the Park Service's general authority over boating and related activities in federally managed preservation areas. Sturgeon, the Park Service, and the Ninth Circuit each adopt a different reading of Section 103(c), reaching different conclusions about the scope of the Park Service's powers.

Sturgeon, joined by the State, understands Section 103(c) to stand for a simple proposition: The Park Service is prohibited from regulating "non-public" land in Alaska

as if that land were owned by the Federal Government. He contends that his reading is consistent with the history of federal land management in Alaska, beginning with the Alaska Statehood Act and culminating in ANILCA.

Sturgeon's argument proceeds in two steps. First, he asserts that the Nation River is not "public land" for purposes of ANILCA and is therefore not part of the Yukon-Charley. As discussed, ANILCA defines "public lands" as lands to which the United States has "title." 16 U. S. C. §3102. And Section 103(c) provides that "[o]nly those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit." §3103(c).

Sturgeon argues that the Nation River is not "public land" because it is owned by the State and not by the Federal Government. To support his argument, Sturgeon relies on the Alaska Statehood Act, which granted ownership of the submerged lands beneath the navigable waters in Alaska, and the resources within those waters, to the State. See §6(m), 72 Stat. 343; 43 U. S. C. §1311(a). He also cites this Court's decision in *United States* v. *California*, 436 U. S. 32 (1978), which stated that "the Submerged Lands Act transferred title to and ownership of the submerged lands and waters" to the States. *Id.*, at 40 (internal quotation marks omitted). Because the State and not the Federal Government owns the Nation River, Sturgeon urges, it is not "public" land under ANILCA and is therefore not part of the Yukon-Charley.

Second, Sturgeon asserts that because the Nation River is not part of the Yukon-Charley, the Park Service lacks authority to regulate it. His argument rests on the second sentence of Section 103(c), which states that "[n]o lands which, before, on, or after December 2, 1980, are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely

to public lands within such units." 16 U. S. C. §3103(c).

Sturgeon argues that the phrase "regulations applicable solely to public lands within such units" refers to those regulations that apply "solely" by virtue of the Park Service's "authority to manage national parks." Brief for Petitioner 18, 26–27. The word "solely," Sturgeon contends, simply ensures that "non-public" lands within the boundaries of those units remain subject to laws generally "applicable to both public and private lands (such as the Clean Air Act and Clean Water Act)." *Id.*, at 19. Because the hovercraft regulation was adopted pursuant to the Park Service's authority over federally managed preservation areas, and is not a law of general applicability like the Clean Air Act or the Clean Water Act, Sturgeon concludes that Section 103(c) bars enforcement of the regulation.

The Park Service, in contrast, reads Section 103(c) more narrowly. In its brief in this Court, the Park Service, while defending the reasoning of the Ninth Circuit, relies primarily on very different arguments. The agency stresses that it has longstanding authority to regulate waters within federally managed preservation areas, and that Section 103(c) does not take any of that authority away. In reaching its conclusion, the Park Service disagrees with Sturgeon at each step.

First, the Park Service contends that the Nation River is part of the Yukon-Charley. To support that contention, the agency cites ANILCA's definition of "public lands," which—as noted—includes "lands, waters, and interests therein" to which the United States has "title." 16 U. S. C. §3102. The Park Service argues that the United States has "title" to an "interest" in the water within the boundaries of the Yukon-Charley under the reserved water rights doctrine.

The reserved water rights doctrine specifies that "when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the

Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert* v. *United States*, 426 U. S. 128, 138 (1976). By creating the Yukon-Charley, the Park Service urges, the Federal Government reserved the water within the boundaries of the conservation system unit to achieve the Government's conservation goals. As a result, the Federal Government has "title" to an "interest" in the Nation River, making it "public" land subject to Park Service regulations.

Second, the Park Service contends that even if the Nation River is not "public" land, the agency still has authority to regulate it. According to the Park Service, the second sentence of Section 103(c) imposes only a limited restriction on the agency's power, prohibiting it from enforcing on "non-public" lands only those regulations that explicitly apply "solely to public lands." The hovercraft regulation applies both within "[t]he boundaries of federally owned lands and waters administered by the National Park Service" *and* to "[w]aters subject to the jurisdiction of the United States located within the boundaries of the National Park System, including navigable waters . . . without regard to the ownership of submerged lands." 36 CFR §1.2(a). Accordingly, the Park Service asserts, the hovercraft regulation does not apply "solely to public lands," and Section 103(c) therefore does not prevent enforcement of the regulation. See Brief for Respondents 56–58.

The Ninth Circuit, for its part, adopted a reading of Section 103(c) different from the primary argument advanced by the Park Service in this Court. The Court of Appeals did not reach the question whether the Nation River counts as "public" land for purposes of ANILCA. Instead, it held that the phrase "regulations applicable solely to public lands within such units" distinguishes between Park Service regulations that apply solely to

"public" lands *in Alaska*, and Park Service regulations
that apply to federally managed preservation areas across
the country. In the Ninth Circuit's view, the Park Service
may enforce nationally applicable regulations on both
"public" and "non-public" property within the boundaries
of conservation system units in Alaska, because such
regulations do not apply "solely to public lands within
such units." The Park Service may not, however, apply
Alaska-specific regulations to "non-public" lands within
the boundaries of those units.

According to the Ninth Circuit, because the hovercraft
regulation "applies to all federal-owned lands and waters
administered by [the Park Service] nationwide, as well as
all navigable waters lying within national parks," the
hovercraft ban does not apply "solely" within conservation
system units in Alaska. 768 F. 3d, at 1077. The Ninth
Circuit concluded that the Park Service therefore has
authority to enforce its hovercraft regulation on the Na-
tion River. *Id.*, at 1078. The Ninth Circuit's holding is
subject to some interpretation, but Sturgeon, the State,
the Alaska Native Corporations, and the Park Service (at
least at times) concur in our understanding of the decision
below. See Brief for Petitioner 25; Brief for State of Alaska
as *Amicus Curiae* 23; Brief for Arctic Slope Regional Cor-
poration et al. as *Amici Curiae* 12–13; Brief for Doyon,
Ltd., et al. as *Amici Curiae* 31–32; Brief for Respondents
20; Tr. of Oral Arg. 61; 80 Fed. Reg. 65573 (2015).

## III

We reject the interpretation of Section 103(c) adopted by
the Ninth Circuit. The court's reading of the phrase "regu-
lations applicable solely to public lands within such units"
may be plausible in the abstract, but it is ultimately in-
consistent with both the text and context of the statute as
a whole. Statutory language "cannot be construed in a
vacuum. It is a fundamental canon of statutory construc-

tion that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts* v. *Sea-Land Services, Inc.*, 566 U. S. \_\_\_, \_\_\_ (2012) (slip op., at 6) (internal quotation marks omitted).

Under the reading of the statute adopted below, the Park Service may apply nationally applicable regulations to "non-public" lands within the boundaries of conservation system units in Alaska, but it may not apply Alaska-specific regulations to those lands. That is a surprising conclusion. ANILCA repeatedly recognizes that Alaska is different—from its "unrivaled scenic and geological values," to the "unique" situation of its "rural residents dependent on subsistence uses," to "the need for development and use of Arctic resources with appropriate recognition and consideration given to the unique nature of the Arctic environment." 16 U. S. C. §§3101(b), 3111(2), 3147(b)(5).

ANILCA itself accordingly carves out numerous Alaska-specific exceptions to the Park Service's general authority over federally managed preservation areas. For example, ANILCA requires the Secretary of the Interior to permit "the exercise of valid commercial fishing rights or privileges" within the National Wildlife Refuge System in Alaska, including the use of "campsites, cabins, motorized vehicles, and aircraft landings directly incident to the exercise of such rights or privileges," with certain exceptions. 94 Stat. 2393. ANILCA also requires the Secretary to "permit on the public lands appropriate use for subsistence purposes of snowmobiles, motorboats, and other means of surface transportation traditionally employed for such purposes by local residents, subject to reasonable regulation." 16 U. S. C. §3121(b). And it provides that National Preserves "in Alaska shall be administered and managed as a unit of the National Park System in the same manner as a national park *except* as otherwise provided in this Act

and *except* that the taking of fish and wildlife for sport
purposes and subsistence uses, and trapping shall be
allowed" pursuant to applicable law. §3201 (emphasis
added).

Many similar examples are woven throughout ANILCA.
See, *e.g.,* 94 Stat. 2393 (Secretary must administer wildlife
refuge "so as to not impede the passage of navigation and
access by boat on the Yukon and Kuskokwim Rivers,"
subject to reasonable regulation); *id.,* at 2388 (Secretary
must allow reindeer grazing uses in certain areas, includ-
ing construction of necessary facilities); 16 U. S. C.
§3203(a) (Alaska-specific rules for wilderness management
apply "in recognition of the unique conditions in Alaska");
§3170(a) (Secretary must permit reasonable use of snow-
machines, motorboats, and airplanes within conserva-
tion system units "for travel to and from villages and
homesites").

All those Alaska-specific provisions reflect the simple
truth that Alaska is often the exception, not the rule. Yet
the reading below would prevent the Park Service from
recognizing Alaska's unique conditions. Under that read-
ing, the Park Service could regulate "non-public" lands in
Alaska only through rules applicable *outside* Alaska as
well. Thus, for example, if the Park Service elected to
allow hovercraft during hunting season in Alaska—in a
departure from its nationwide rule—the more relaxed
regulation would apply only to the "public" land within the
boundaries of the unit. Hovercraft would still be banned
from the "non-public" land, even during hunting season.
Whatever the reach of the Park Service's authority under
ANILCA, we cannot conclude that Section 103(c) adopted
such a topsy-turvy approach.

Moreover, it is clear that Section 103(c) draws a distinc-
tion between "public" and "non-public" lands within the
boundaries of conservation system units in Alaska. See
§3103(c) ("Only those lands within the boundaries of any

conservation system unit which are public lands . . . shall be deemed to be included as a portion of such unit"); *ibid.* (No lands "conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units"). And yet, according to the court below, if the Park Service wanted to differentiate between that "public" and "non-public" land in an Alaska-specific way, it would have to regulate the "non-public" land pursuant to rules applicable outside Alaska, and the "public" land pursuant to Alaska-specific provisions. Assuming the Park Service has authority over "non-public" land in Alaska (an issue we do not decide), that strikes us as an implausible reading of the statute.

Looking at ANILCA both as a whole and with respect to Section 103(c), the Act contemplates the possibility that all the land within the boundaries of conservation system units in Alaska may be treated differently from federally managed preservation areas across the country, and that "non-public" lands within the boundaries of those units may be treated differently from "public" lands within the unit. Under the Ninth Circuit's reading of Section 103(c), however, the former is not an option, and the latter would require contorted and counterintuitive measures.

We therefore reject the interpretation of Section 103(c) adopted by the court below. That reading of the statute was the sole basis for the disposition of this case by the Court of Appeals. We accordingly vacate the judgment of that court and remand for further proceedings.

We do not reach the remainder of the parties' arguments. In particular, we do not decide whether the Nation River qualifies as "public land" for purposes of ANILCA. Sturgeon claims that it does not; the Park Service that it does. The parties' arguments in this respect touch on vital issues of state sovereignty, on the one hand, and federal authority, on the other. We find that in this case those

issues should be addressed by the lower courts in the first instance.

Given this determination, we also do not decide whether the Park Service has authority under Section 100751(b) to regulate Sturgeon's activities on the Nation River, even if the river is not "public" land, or whether—as Sturgeon argues—any such authority is limited by ANILCA. Finally, we do not consider the Park Service's alternative argument that it has authority under ANILCA over both "public" and "non-public" lands within the boundaries of conservation system units in Alaska, to the extent a regulation is written to apply specifically to both types of land. We leave those arguments to the lower courts for consideration as necessary.

The judgment of the Court of Appeals for the Ninth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*