Concurrence by Judge Nguyen
OPINION
NGUYEN, Circuit Judge:
John Sturgeon would like to use his hovercraft in a national preserve to reach moose hunting grounds. The State of Alaska is fíne with that;[1] the federal government is not. Sturgeon’s case turns on which entity—state or federal—gets to decide the matter. On remand from the Supreme Court, we again conclude that the federal government properly exercised its authority to regulate hovercraft use on the rivers within conservation system units in Alaska.
I.
A.
The Yukon-Charley Rivers National Preserve conservation system unit (“Yukon-Charley”) is among the 104 million acres of land in Alaska set aside for preservation purposes by the Alaska National Interest Lands Conservation Act (“ANILCA”), 16 U.S.C. § 3101 et seq. (1980). Like other conservation system units created by ANILCA, Yukon-Charley was drawn around a mix of federal, state, Native Corporation, and private owners.
Within the boundaries of the Yukon-Charley lies a stretch of the Nation River. Sturgeon would like to travel by hovercraft on this part of the river to get to moose hunting grounds located upstream from the preserve. Park Service regulations prohibit the use of hovercraft within “[w]a-ters subject to the jurisdiction of the United States located within the boundaries of the National Park System ... without regard to the ownership of submerged lands, tidelands, or lowlands.” 36 C.F.R. § 1.2(a)(3); see id. § 2.17(e). Alaska permits hovercraft on its waterways. Sturgeon contends that the Nation River belongs to Alaska and that the Park Service has no authority to regulate it. He seeks declara *930 tory and injunctive relief preventing the Park Service from enforcing its hovercraft ban.
B.
ANILCA balanced the need to protect “the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska” with the need to provide “adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people.” 16 U.S.C. § 3101(d). Thus, while ANILCA provided that conservation system units in Alaska generally “shall be administered ... under the laws governing the administration of [National Park Service system unit] lands,” id. § 410hh, it “specified that the Park Service could not prohibit on those lands certain activities of particular importance to Alaskans.” Sturgeon v. Frost, — U.S. —, 136 S.Ct. 1061, 1066, 194 L.Ed.2d 108 (2016). For example, Park Service regulations applicable nationwide prohibit hunting and snowmobiling for the most part, see 36 C.F.R. §§ 2.2, 2.18, whereas ANILCA permits, subject to reasonable regulations, “the use of snowma-chines ... for travel to and from villages and homesites,” 16 U.S.C. § 3170(a), and “the taking of ... wildlife for sport purposes and subsistence uses,” id. § 3201.
II.
“Section 103(c) of ANILCA ... addresses the scope of the Park Service’s authority over lands within the boundaries of conservation system units in Alaska.” Sturgeon, 136 S.Ct. at 1067. It provides as follows:
Only those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit. No lands which, before, on, or after December ¾ 1980, are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units. If the State, a Native Corporation, or other owner desires to convey any such lands, the Secretary may acquire such lands in accordance with applicable law (including this Act), and any such lands shall become part of the unit, and be administered accordingly.
16 U.S.C. § 3103(c) (emphasis added). The parties dispute the meaning of section 103(c) and in particular what it means to “be subject to the regulations applicable solely to public lands within such units.”
The key to understanding section 103(c) is the difference between “Federal lands” and “public lands.” ANILCA defines “public lands” as “land situated in Alaska which, after December 2, 1980, are Federal lands” except for land selected by the State of Alaska or a Native Corporation the title to which has not yet' been conveyed. Id. § 3102(3). Similarly, “Federal land” is defined as “lands the title to which is in the United States after December 2, 1980.” Id. § 3102(2). Simply put, Federal lands include land selections made by Alaska and Native Corporations but not yet transferred to them. Public lands do not. These land selections, while still formally belonging to the federal government, are not to be regulated as part of conservation system units.
The first sentence of section 103(c) establishes that the land selections by Alaska and Native Corporations are not “deemed to be included as a portion of such unit[s]” because that distinction belongs “[o]nly” to “public lands.” Both the first and third sentences refer to public lands as being “a portion of’ or “part of’ the conservation system units in Alaska. This is distinct from lands that are merely “within such units,” a phrase used in the second sen *931 tence as shorthand for lands “within the boundaries of’ such units but not necessarily a part of them. Land “within such units” includes public lands, the land selections, and non-federal lands. See, e.g., Solid Waste Sites in Units of the National Park System, 59 Fed. Reg. 65,948, 65,949 (Dec. 22, 1994) (“[T]he phrase ‘within the boundaries’ is commonly employed to refer to both Federal land and nonfederally owned land or interests in land within the outer boundaries [of] a [National Park System] unit.”).
The confusion in the second sentence stems from the awkward placement of “within such units.” The phrase is not modified by “solely.” See Sturgeon, 136 S.Ct. at 1070. Rather, it modifies “applicable.” Thus, “regulations applicable solely to public lands within such units” means regulations applicable within such units solely to public lands—as opposed to Federal lands. In other words: regulations that apply only to lands that are deemed part of the units themselves. Outside Alaska, all federally owned lands within conservation system units are deemed part of the unit. See 54 U.S.C. § 100501. “Alaska is different.” Sturgeon, 136 S.Ct. at 1070.
The import of the second sentence is that Federal lands within conservation system units that have been transferred to a non-federal party—like Federal lands that have been selected for state or tribal use—are not “subject to” regulations specific to the conservation system units.[2] Regulations applicable solely to public lands include Park Service regulations applicable nationwide and Alaska-specific regulations found in ANILCA.[3] These contrast with regulations of general applicability, such as the Clean Air Act, that also affect non-public lands located within such units, such as the land selections and private lands.
Section 103(c) directly responds to the controversy that “Congress ... stepped in to settle” when it enacted ANILCA. Sturgeon, 136 S.Ct. at 1066. Many Alaskans “were concerned that ... new monuments [designated by President Carter] would be subject to restrictive federal regulations.” Id. at 1065-66. By exempting Federal lands selected for state or tribal use from being regulated as a part of the unit, AN-ILCA serves one of its stated goals of providing “adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people.” 16 U.S.C. § 3101(d).
Of course, regulation by the Park Service serves ANILCA’s other goal of providing “sufficient protection for the national interest in the scenic, natural, cultural and environmental values.” Id. But that goal is expressly limited to “public lands” in Alaska. Id. Land that is transferred to or selected for non-federal entities is gen *932 erally not subject to the regulation of conservation system units. However, non-public land is still subject to such regulation if the United States retains an interest in it because the land is public to the extent of the interest.[4] That is clear from ANILCA’s definition of “land” -as “lands, waters, and interests therein.” Id. § 3102(1) (emphasis added).
ANILCA recognizes that the federal government retains an interest in at least some otherwise non-public lands. It directs the Secretary of the Interior to “develop and transmit to ... Congress a conservation and management plan for each of the units of the National Park System established or [expanded] by [ANILCA].” Id. § 3191(a). One component of the plan is a description of any privately-owned areas within the unit, their purposes, the actual or anticipated activities in the privately-owned areas, the effects of such activities on the unit, and “methods (such as cooperative agreements and issuance or enforcement of regulations) of controlling the use of such activities to carry out the policies of [ANILCA] and the purposes for which such unit is established or expanded.” Id. § 3191(b)(7)(E) (emphasis added). Congress plainly expected that the Park Service could issue regulations governing conservation system units that would affect privately-owned lands.
III.
The hovercraft ban “do[es] not apply on non-federally owned lands and waters ... located within National Park System boundaries,” 36 C.F.R. § 1.2(b), except, as relevant here, on “[w]aters subject to the jurisdiction of the United States,” id. § 1.2(a)(3), and on “[o]ther ... waters over which the United States holds a less-than-fee interest, to the extént necessary to fulfill the purpose of the National Park Service administered interest and compatible with the nonfederal interest,” id. § 1.2(a)(5). The question is whether the Nation River is subject to the jurisdiction or an interest of the United States such that it is public land that the Park Service is authorized to regulate.
A.
Before Alaska gained statehood, the Submerged Lands Act “release[d] and re-linquishe[d] unto [the] States ... all right, title, and interest of the United States” to “the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters.” 43 U.S.C. § 1311(a)—(b). The Alaska Statehood Act secured these rights for Alaska. Pub. L. No. 85-508, § 6(m), 72 Stat. 343 (1958). In addition, Alaska enjoys similar rights under the equal footing doctrine. See United States v. Alaska, 521 U.S. 1, 6, 117 S.Ct. 1888, 138 L.Ed.2d 231 (1997). While “the United States can prevent lands beneath navigable waters from passing to a State upon admission to the Union by reserving those lands in federal ownership” for “an appropriate public purpose,” id. at 33-34, 117 S.Ct. 1888; see also 43 U.S.C. § 1313(a) (excepting from the Submerged Lands Act “lands expressly retained by ... the United States when the State entered the Un-ión”), we have held that the Nation River was navigable at statehood and that Alaska took title to the riverbed at that time. *933 See Alaska v. United States, 201 F.3d 1154, 1160, 1166 (9th Cir. 2000).
But lands submerged beneath inland waterways are distinct from the waterways themselves.[5] “Ownership [of submerged lands]' may not be necessary for federal regulation of navigable waters .... ” Alaska, 521 U.S. at 42, 117 S.Ct. 1888. Under the Submerged Lands Act, “[t]he United States retains all its navigational servitude and rights in and powers of regulation and control of [submerged] lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs.” 43 U.S.C. § 1314(a).
We have held that the navigational servitude “is not ‘public land’ within the meaning of ANILCA” because “the United States does not hold title to the ... servitude.” City of Angoon v. Hodel, 803 F.2d 1016, 1027 n.6 (9th Cir. 1986) (per curiam) (citing United States v. Va. Elec. & Power Co., 365 U.S. 624, 627-28, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961)). We expanded that holding in Alaska v. Babbitt (Katie John I), deciding that Congress did not intend “to exercise its Commerce Clause powers over submerged lands and navigable Alaska waters” when it enacted ANILCA. 72 F.3d 698, 703 (9th Cir. 1995).
Katie John I analyzed .the United States’ interest in navigable waters in Alaska under the reserved water rights doctrine. Under this doctrine, when the federal government “withdraws its land from the public domain and reserves it for a federal purpose,” the government impliedly “reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation.” Cappaert v. United States, 426 U.S. 128, 138, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976). The United States thus “acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators.” Id.
Whether a federally reserved water right is implicit in a federal reservation of public land depends on whether the government intended to reserve unappropriated water. Id. at 139, 96 S.Ct. 2062. “Intent is inferred if the previously unappropriated waters are necessary to accomplish the purposes for which the reservation was created.” Id.
In Katie John I, we concluded that “[t]he United States has reserved vast parcels of land in Alaska for federal purposes through a myriad of statutes,” including ANILCA, and thereby has “implicitly reserved appurtenant waters, including appurtenant navigable waters, to the extent needed to accomplish the purposes of the reservations.” 72 F.3d at 703 & n.10. This reservation of water rights gave the United States “interests in some navigable waters.” Id. at 703. We held that ANILCA’s “definition of public lands includes those *934 navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine.” Id. In John v. United States (Katie John II), we decided without discussion that Katie John I’s holding “should not be disturbed or altered.” 247 F.3d 1082, 1083 (9th Cir. 2001) (en banc) (per curiam).
In Katie John III, we considered regulations implementing Title VIII of ANILCA pertaining to subsistence management on public lands, 36 C.F.R. pt. 242. These regulations “included within the definition of ‘public lands’ ”—and thus applied to—“all navigable and non-navigable water within the outer boundaries of ... 34 listed land units,” including Yukon-Charley. Katie John III, 720 F.3d at 1232; see 36 C.F.R. § 242.3(c)(28). As here, it was argued that State and privately-owned lands located within a conservation system unit, referred to as “inholdings,” were not public lands and thus not subject to regulation. Id. at 1233.
We upheld the agency’s inclusion of waters that lie on inholdings in the definition of public lands. Id. We reasoned that water rights impliedly acquired by the United States are not forfeited or conveyed to third parties along with the inholdings. Id. Because the water bodies were “actually situated within the boundaries of federal reservations,” it was “reasonable to conclude that the United States ha[d] an interest in such waters for the primary purposes of the reservations.” Id.
B.
We are bound under our Katie John precedent to reach a similar conclusion here. To begin with, ANILCA’s definition of “public lands” applies throughout the statute. It would be anomalous if we treated the regulation at issue in Katie John III regarding the geographic scope of regulations implementing Title VIII, 36 C.F.R. § 242.3, as employing a different construction of “public lands” than applicable elsewhere in ANILCA. The regulation does not define “public lands.” By merely referencing the term,[6] which is defined globally in the statute, the regulation implies that there is but a single definition.
While Katie John III involved ANIL-CA’s rural subsistence priority, that was only one of the purposes for which ANIL-CA reserved lands as conservation system units. Katie John III recognized that “water rights may be essential to a purpose of the reservation other than subsistence.” 720 F.3d at 1240. Just as important was ANILCA’s purpose of “providing] sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska.” 16 U.S.C. § 3101(d).
Three years before the statute’s enactment, President Carter withdrew and reserved the land for Yukon-Charley “for the protection of ... historical, archeological, biological, [and] geological ... phenomena” including habitat for “isolated wild populations of Dali sheep, moose, bear, wolf, and other large mammals.” Proclamation No. 4626, 43 Fed. Reg. 57,113 (Dec. 5, 1978). In particular, he “reserved all water necessary to the proper care and management of those objects protected by [Yukon-Charley] and for [Yukon-Charley’s] proper administration.” Id. at 57,114. In that vein, Congress specified in section 201 of ANILCA that Yukon-Charley “shall *935 be managed for the following purposes, among others”:
To maintain the environmental integrity of the entire Charley River basin, including streams, lakes and other natural features, in its undeveloped, natural condition for public benefit and scientific study; to protect habitat for, and populations of, fish and wildlife, including but not limited to the peregrine falcons and other raptorial birds, caribou, moose, Dali sheep, grizzly bears, and wolves....
16 U.S.C. § 410hh(10) (emphasis added).
Consistent with this intent, Congress has authorized the Secretary of the Interi- or to “prescribe regulations ... concerning boating and other activities on or relating to water located within System units, including water subject to the jurisdiction of the United States.” 54 U.S.C. § 100751(b). The Park Service’s hovercraft ban, applicable to federally managed conservation areas nationwide, “was adopted pursuant to [§ ] 100751(b).” Sturgeon, 136 S.Ct. at 1067. To be more precise, the hovercraft ban was adopted pursuant to § 100751(b)’s statutory predecessor, which similarly provided the Secretary of the Interior with the authority to “[pjromulgate and enforce regulations concerning boating and other activities on or relating to waters located within areas of the National Park System, including waters subject to the jurisdiction of the United States.” 16 U.S.C. § 1a-2(h) (1982).[7] This earlier version was enacted four years before ANILCA. Act to Amend the Administration of the National Park System, Pub. L. No. 94-458, 90 Stat. 1939 (1976). ANILCA specified that it did not in any way affect “any law governing appropriation or use of, or Federal right to, water on lands within the State of Alaska,” and did not supersede, modify, or repeal “existing laws applicable to the various Federal agencies which are authorized to develop or participate in the development of water resources or to exercise licensing or regulatory functions in relation thereto.” 16 U.S.C. § 3207(1), (3).
The hovercraft ban is also consistent with Congressional intent. Hovercraft were prohibited “because they provide virtually unlimited access to park areas and introduce a mechanical mode of transportation into locations where the intrusion of motorized equipment by sight or sound is generally inappropriate.” General Regulations for Areas Administered by the National Park Service, 48 Fed. Reg. 30,252, 30,258 (June 30, 1983). The hovercraft ban thus serves the purpose of keeping waterways in their “undeveloped natural condition ... to protect [wildlife] habitat.” 16 U.S.C. § 410hh(10).
C.
Sturgeon argues that “[r]eserved water rights are not a ‘title’ interest.” While that is true in a narrow, technical sense, see Fed. Power Comm’n v. Niagara Mohawk Power Corp., 347 U.S. 239, 247 n.10, 74 S.Ct. 487, 98 L.Ed. 666 (1954) (“Neither sovereign nor subject can acquire anything more than a mere usufructuary right [in the water itself]....”), by the same logic the State also lacks a “title” interest in the waters above its riverbeds. Water cannot be owned, see, e.g., 2 Amy K. Kelley, Waters and Water Rights § 36.02 (3d ed. 2017) (observing the Supreme Court’s impatience “with claims of absolute *936 ‘ownership’ by either [state or federal] government”), but “the right of [water’s] use, as it flows along in a body, may become a property right.” Niagara Mohawk Power Corp., 347 U.S. at 247 n.10, 74 S.Ct. 487.
The word “title” has many meanings. Equitable title, for example, is a beneficial interest in property. See, e.g., R.T. Vanderbilt Co. v. Babbitt, 113 F.3d 1061, 1067 n.6 (9th Cir. 1997) (using the phrases “vested interest” and “equitable title” interchangeably). Thus, “title” to an “interest” in water almost certainly means a vested interest in the water, such as a reserved water right. But even if we were uncertain, Katie John I already decided the matter when it held that ANILGA’s “definition of public lands includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine.” 72 F.3d at 704. That could not be so unless title to an interest in Alaska’s navigable waters is in the United States. See 16 U.S.C. § 3102(1)—(3).
Sturgeon also argues that “[t]he reserved water rights doctrine is premised on the need for actual use and withdrawal of water” and that the Park Service has shown no need for a specific quantity of water because the water in conservation system units is. not scarce. Katie John III forecloses that argument. There was similarly “no suggestion that any federal reservation along any Alaskan waters risks being turned into a ‘barren waste’ ..., or a substantially diminished pool ..., or is in any way short of water.” 720 F.3d at 1238. For that reason, in determining the geographic scope of the United States’ reserved water rights, Katie John III “include[d] ... all the bodies of water on which the United States’ reserved rights could at some point be enforced—ie., those waters that are or may become necessary to fulfill the primary purposes of the federal reservation at issue.” Id. at 1231 (emphasis added). Here, one of the reservation’s primary purposes is to protect fish. The diminution of water in any of the navigable waters within Yukon-Ohar-ley’s boundaries would necessarily impact this purpose, giving rise to a reserved water right.
Sturgeon points out that some 18 million acres within ANILCA-established conservation system units, approximately one-sixth of the total, are land selections for Native Corporations. He worries that federal regulation of navigable waters within the units will result in “economic catastrophe” to native shareholders by “impeding any efforts ... to productively utilize their lands.” Even if true, that is not at issue in this case. Sturgeon lacks standing to assert hypothetical claims on the Native Corporations’ behalf. In any event, “Congress clearly did not state in ANILCA that subsistence uses are always more important than ... other uses of federal lands; rather, it expressly declared that preservation of subsistence resources is a public interest and established a framework for reconciliation, where possible, of competing public interests.” Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545-46, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Should Sturgeon’s concerns materialize, they can be resolved in an appropriate case.
IV.
ANILCA section 103(c) does not limit the Park Service from applying the hovercraft ban on the Nation River in Yukon-Charley because, under our Katie John precedent, the United States has an implied reservation of water rights, rendering the river public lands. Therefore, the district court’s order granting summary judgment to defendants is
AFFIRMED.

. We previously upheld as reasonable an agency determination that certain regulations specific to Alaska units applied to land selections as well as Federal lands. See John v. United States (Katie John III), 720 F.3d 1214, 1244-45 (9th Cir. 2013) (construing 36 C.F.R. § 242.4(2)). The basis for this holding was the apparently “inconsistent” directive in section 906(o)(2) of ANILCA: "Until conveyed, all Federal lands within the boundaries of a conservation system unit ... shall be administered in accordance with the laws applicable to such unit.” 43 U.S.C. § 1635(o)(2). Subsection (o), however, concerns land withdrawals—not land selections—and it expressly does not apply to those subsections of § 1635 pertaining to land selections. See id. § 1635(o)(1). Regardless, Katie John III acknowledged that "[s]ection 102 of ANILCA expressly excludes selected-but-not-yet-conveyed lands from the definition of ‘public lands.’ ” Katie John III, 720 F.3d at 1243.

. Of course, Park Service regulations applicable to conservation system units nationwide may be modified by Alaska-specific regulations. See 36 C.F.R. § 13.2(a).

. The parties disagree about the Park Service's authority to regulate lands to and in which the United States has no title or interest by enacting regulations that apply to public and non-public land alike. We need not decide whether such a regulation would be enforceable on non-public land on the ground that it is not "applicable solely to public lands.” 16 U.S.C. § 3103(c).

. Sturgeon, suggesting otherwise, quotes the Supreme Court's statement that "the Submerged Lands Act transferred 'title to and ownership of the submerged lands and waters.” United States v. California, 436 U.S. 32, 40, 98 S.Ct. 1662, 56 L.Ed.2d 94 (1978) (emphasis added) (quoting 43 U.S.C. § 1311(a)). We do not understand the Supreme Court to have breezily adopted an interpretation of the Submerged Lands Act at odds with the statute’s plain meaning. In contrast to ANILCA, which includes “waters" within the definition of "lands,” the Submerged Lands Act distinguishes "lands” from the various "waters” lying above them. 43 U.S.C. § 1301(a). California involved a dispute over the right to license kelp harvesting, see 436 U.S. at 35 n.8, 98 S.Ct. 1662; neither "ownership of” nor rights to the waters was at issue. Presumably, the Court used “submerged lands and waters” to refer to submerged lands and water resources. See 43 U.S.C. § 1301(e) ("The term 'natural resources’ includes ... kelp.... ”).

. The Title VIII regulations “apply on all public lands” within some conservation system units, id. § 242.3(b), but “exclud[e] marine waters” within others, id. § 242.3(c). Outside of the enumerated conservation system units, Title VIII regulations “apply on all other public lands, other than to the military, U.S. Coast Guard, and Federal Aviation Administration lands that are closed to access by the general public." Id. § 242.3(d).

. The hovercraft ban was implemented in 1983. See General Regulations for Areas Administered by the National Park Service, 48 Fed. Reg. 30,252, 30,258 (June 30, 1983). Section 100751(b) took effect in 2014 when Congress added Title 54 to consolidate “provisions relating to the National Park Service and related programs” in "one distinct place.” H.R. Rep. No. 113-44, at 2 (2013).