**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MONSSEF CHENEAU,<br>*Petitioner*,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney General,<br>*Respondent*. | No. 15-70636<br><br>Agency No.<br>A077-279-939<br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted En Banc March 22, 2021[*]
San Francisco, California

Filed May 13, 2021

Before: Sidney R. Thomas, Chief Judge, and M. Margaret
McKeown, Kim McLane Wardlaw, Richard A. Paez,
Morgan Christen, Mark J. Bennett, Eric D. Miller, Daniel
A. Bress, Danielle J. Hunsaker, Patrick J. Bumatay, and
Lawrence J. VanDyke, Circuit Judges.

Opinion by Chief Judge Thomas;
Dissent by Judge Bress

---

[*] The en banc court unanimously concludes this case is suitable for
decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

# SUMMARY[**]

---

### Immigration

Remanding to the three-judge panel that previously denied Monssef Cheneau's petition for review of a decision of the Board of Immigration Appeals, the en banc court held that the second clause of the derivative citizenship statute set out at former 8 U.S.C. § 1432(a)(5) does not require that the child have been granted lawful permanent residency prior to the age of eighteen in order to derive citizenship from a parent who naturalized, but the child must have demonstrated an objective official manifestation of permanent residence.

Former 8 U.S.C. § 1432(a)(5) (1994) (repealed 2000) provides two different pathways to child of a naturalized parent to derive U.S. citizenship: 1) a child "residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent" is eligible; and 2) a child is eligible who "thereafter begins to reside permanently in the United States while under the age of eighteen years."

Cheneau entered the United states lawfully at age thirteen under a non-immigrant student visa. His mother naturalized in 1999, he applied for adjustment of status to lawful permanent resident at age fifteen in 2000, and was granted adjustment of status in 2003, after he turned eighteen. After theft convictions, removal proceedings were initiated, and Cheneau moved to terminate, asserting a claim of derivative

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

citizenship. The three-judge panel in this case held that it was required to hold that Cheneau was not a derivative citizen under either pathway because this court, in *Romero-Ruiz v. Mukasey*, 538 F.3d 1057 (9th Cir. 2008), had held that both pathways required the child to have lawful permanent resident status.

Reconsidering *Romero-Ruiz* in the present context, the en banc court concluded that Congress did not intend to require lawful permanent residency for the second pathway. First, the en banc court observed that Congress chose to use two different terms in the statute, creating a presumption that the terms have different meanings. Second, the en banc court explained that the two terms have different meanings in the Immigration and Nationality Act ("INA"). Third, the en banc court concluded that construing the second pathway to derivative citizenship as not requiring lawful permanent residence does not render either provision superfluous, as the court suggested in *Romero-Ruiz*. Rather, each pathway applies *distinct* requirements to *distinct* categories of children with *distinct* timing, and does so with logical reason. Finally, the en banc court explained that Congress's decision to eliminate the "reside permanently" pathway and narrow the availability of derivative citizenship in 2000 indicates that the previous version of the statute was broader.

The en banc court also explained that the history of the INA (which was enacted in 1952 and established lawful permanent residency as a term of art) and earlier naturalization statutes further buttressed its conclusion that Congress intended "reside permanently" and "lawful admission for permanent residence" to have different meanings. Further, the en banc court concluded that the tenet of statutory construction that repetition of the same language

in a new statute generally indicates the intent to incorporate its administrative and judicial interpretations as well did not apply, because none of the administrative or judicial interpretations preceding the INA had "settled" whether "reside permanently" could mean lawfully residing on a temporary visa with the intent to remain permanently.

Finally, the en banc court agreed with the Second Circuit that, to satisfy the "reside permanently" requirement in the second pathway, an individual must demonstrate "some objective official manifestation of the child's permanent residence." Here, the en banc court explained, Cheneau filed an application for adjustment of status after his mother naturalized, expressing such intent to reside permanently.

Dissenting, Judge Bress, joined by Judges Hunsaker, Bumatay, and VanDyke, wrote that the en banc court's decision adopted the very "unreasonable" reading of the statute that *Romero-Ruiz* had rejected. Judge Bress concluded that the new interpretation: 1) is an untenable construction of the statutory text; 2) fails to account for decades of statutory history in which derivative citizenship necessarily required *lawful* permission to reside permanently in the United States—the legal backdrop against which the statutory language "reside permanently" has long existed in our immigration law: and 3) produces significant problems of practical administration, creating confusion as to who qualifies for derivative citizenship while extending derivative citizenship without authorization to a potentially wide range of additional people—including people like the petitioner in this case, who committed crimes in this country and who might otherwise be removable.

## COUNSEL

Kari E. Hong, Boston College Law School, Newton, Massachusetts, for Petitioner.

Craig A. Newell Jr., Trial Attorney; Emily Anne Radford, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Brian P. Goldman and Sachi Schuricht, Orrick Herrington & Sutcliffe LLP, San Francisco, California, for Amici Curiae ACLU of Southern California, Al Otro Lado, Federal Defenders of San Diego Inc., Florence Immigrant and Refugee Rights Project, Northwest Immigrant Rights Project, Public Counsel, Margaret Stock, U.C. Davis Immigrant Law Clinic, and Unified U.S. Deported Veterans Resource Center.

Sabrineh Ardalan and Philip L. Torrey, Attorneys; George Biashvili, Salah Muhiddin, and Michael Shang, Law Students; Harvard Immigration and Refugee Clinical Program, Cambridge, Massachusetts; for Amici Curiae Immigration Law Scholars.

**OPINION**

THOMAS, Chief Judge:

We voted to rehear this case en banc to consider the requirements for two different pathways by which a child of a naturalized citizen parent can derive U.S. citizenship under former 8 U.S.C. § 1432(a)(5) (1994) (repealed 2000). Under the first pathway, a child "residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent" is eligible for derivative citizenship; under the second, a child is eligible who "thereafter begins to reside permanently in the United States while under the age of eighteen years." *Id.*

A three-judge panel of this court previously interpreted this statute, holding that both pathways required the child to have lawful permanent resident status. *See Romero-Ruiz v. Mukasey*, 538 F.3d 1057, 1062–63 (9th Cir. 2008). In re-examining *Romero-Ruiz*, we now conclude that the phrase "or thereafter begins to reside permanently in the United States," 8 U.S.C. § 1432(a)(5), does not require that the child have necessarily been granted lawful permanent residency, although the child must have demonstrated an objective official manifestation of permanent residence. With this clarification, we remand this case to its three-judge panel so that the panel may, in its discretion, apply the revised rule to this case.

I

The facts of the case are detailed in the panel opinion, and we need not recount them here in detail. *See Cheneau v. Barr*, 971 F.3d 965, 966–67 (9th Cir. 2020). In brief,

Cheneau entered the United States lawfully at age thirteen under a non-immigrant student visa. *Id.* at 966. His mother was naturalized in 1999, and he applied for adjustment of status to lawful permanent resident at age fifteen, in 2000. *Id.* Due to an administrative error, he was not granted adjustment of status until 2003, after he had turned eighteen. *Id.* at 966–67. Years later, the Department of Homeland Security initiated removal proceedings after Cheneau's convictions for various theft offenses. *Id.* at 967. Cheneau moved to terminate, asserting a claim of derivative citizenship. *Id.*

The three-judge panel held, in a per curiam opinion, that under *Romero-Ruiz* the panel was required to hold that Cheneau was not a derivative citizen under either pathway of § 1432(a)(5). *See Cheneau*, 971 F.3d at 969–70. The applicable statute provides that a child born outside the United States may obtain derivative citizenship on the basis of a parent's naturalization if:

> Such child is residing in the United States *pursuant to a lawful admission for permanent residence* at the time of the naturalization of the parent . . . or *thereafter begins to reside permanently* in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a)(5) (1994) (emphasis added).[1]    The
*Cheneau* panel concluded that, since "under [*Romero-Ruiz*]
'lawful admission for permanent residence' is required by
*both* provisions of clause (5)," Cheneau was not eligible for
derivative citizenship.  971 F.3d at 969.

However, the entire panel joined a concurring opinion,
authored by Judge Bennett, encouraging this Court to revisit
*Romero-Ruiz*.  The concurrence noted that "Congress chose
two different phrases—one that refers to status while the
other refers to actual residence"—that "have been used in
other sections of the [Immigration and Nationality Act
("INA")] to mean different things." *Cheneau*, 971 F.3d at 977
(Bennett, J., concurring).    The concurrence urged
reexamination because *Romero-Ruiz* "was phrased too

---

[1] Section 1432 was repealed in 2000 and replaced with a new
derivative citizenship provision, codified at 8 U.S.C. § 1431(a). The panel
addressed the applicability of § 1432(a)(5) (1994) in Cheneau's case
because "[t]he applicable version [of the statute] is the one that was 'in
effect at [the] time the critical events giving rise to eligibility occurred.'"
*Cheneau*, 971 F.3d at 968 (quoting *Minasyan v. Gonzales*, 401 F.3d 1069,
1075 (2005)).  Which statute applied depended on whether the critical
event was Cheneau's application for adjustment of status, filed in 2000,
or his actually obtaining lawful permanent resident status in 2003.
Whether either event qualified as the "critical event[] giving rise to
eligibility" depended on the interpretation of § 1432(a)(5). If the statute
required lawful permanent resident status under each pathway, then
Cheneau's 2003 acquiring of such status would be the critical event; if
only some objective manifestation of "residing permanently" was
necessary under the second pathway, then his 2000 application for
adjustment of status would be the critical event.  *See Cheneau*, 971 F.3d
at 968–69.  The panel concluded that "[u]nder *Romero-Ruiz*, the critical
event of Cheneau obtaining lawful permanent resident status happened in
2003, more than two years after § 1432(a) was repealed, and that section
is therefore not applicable."  *Id.* at 970 (applying 8 U.S.C. § 1431(a)
instead).

broadly and established a rule that, although understandable in the circumstances presented in that case, leads to an incorrect result when applied here." *Id.* at 970.

II

In *Romero-Ruiz*, we initially considered the construction of § 1432(a)(5), addressing "the question of whether an immigrant who did not have lawful permanent resident status at the time of his mother's naturalization is eligible for derivative citizenship." 538 F.3d at 1060. Born in Mexico in 1981, Romero-Ruiz entered the United States without admission in 1985, lived in the United States without lawful status, and applied for adjustment of status at age seventeen after his mother naturalized. *Id.* However, while his application was pending, he left the country. *Id.* We held that both pathways required that a child have lawful permanent resident status as a prerequisite to obtaining derivative citizenship, since "[t]he phrase 'or thereafter begins to reside permanently' alters only the *timing* of the residence requirement, not the requirement of *legal* residence." *Id.* at 1062. In doing so, we conducted a surplusage analysis, concluding that "[t]o interpret the second clause as conferring derivative citizenship on children who otherwise meet the requirements as long as they are permanently living in the United States would render the first clause—requiring legal permanent residence—superfluous." *Id.*

Subsequently, other circuits have interpreted the statute differently. The Second Circuit in *Nwozuzu v. Holder*, 726 F.3d 323 (2d Cir. 2013), declined to read a lawful permanent residence requirement into the second pathway. The court concluded that the second pathway permitted a

minor to derive citizenship if, after a parent's naturalization, he "'beg[an] to reside permanently in the United States while under the age of eighteen years'—irrespective of whether he had been lawfully admitted for permanent residence before turning eighteen." *Id.* at 329 (alteration in original) (quoting 8 U.S.C. § 1432(a)(5)). Similarly, although declining to adopt either construction of the statute, the First Circuit noted "contrary indications" that point to "reside permanently" not being "just a shorthand for 'resid[e] . . . pursuant to a lawful admission for permanent residence.'" *Thomas v. Lynch*, 828 F.3d 11, 15 (1st Cir. 2016) (alteration and omission in original) (concluding that Thomas was not entitled to derivative citizenship under either construction, *id.* at 17–18).[2]

## III

"As with any question of statutory interpretation, our analysis begins with the plain language of the statute." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (citation omitted). "[W]hen deciding whether the language is plain, [we] must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). In addition, we examine the statutory structure and "other traditional aids of statutory interpretation" in order to

---

[2] By contrast, the Eleventh Circuit agreed with our reasoning in *Romero-Ruiz*, and held that lawful permanent residency was required for § 1432(a)(5)'s second pathway. *See United States v. Forey-Quintero*, 626 F.3d 1323, 1327 (11th Cir. 2010) (agreeing with *Romero-Ruiz* that "requiring anything less than the status of lawful permanent resident would essentially render the first clause of subsection 5 'mere surplusage'").

ascertain congressional intent. *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981). As part of our statutory analysis, "[w]e also look to similar provisions within the statute as a whole and the language of related or similar statutes to aid in interpretation." *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013).

In reconsidering *Romero-Ruiz* in the present context, we are persuaded that the language of *Romero-Ruiz* swept too broadly and requires modification. Our conclusion is based on the text of the statute itself, the legislative history of derivative citizenship provisions, and the application of traditional tools of statutory interpretation. Ultimately, we conclude that Congress did not intend to require lawful permanent residency for the second pathway to derivative citizenship under the prior statute.

## A

As always, we begin with the plain words of the statute, employing the familiar canons of statutory construction. *Bottinelli v. Salazar*, 929 F.3d 1196, 1199 (9th Cir. 2019). In doing so, we are mindful of "the usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (internal quotation marks and citation omitted). Several features of the text of the statute persuade us that the second pathway of § 1432(a)(5) does not require lawful permanent residency.

First, Congress chose to use two different terms in the statute. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the

same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) (alteration in original) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). This presumption applies with even greater force here, where Congress used particular language in one provision and not in another provision of the same subsection of the same statute. *See Cheneau*, 971 F.3d at 972 (Bennett, J., concurring). And, because the term "reside permanently" was carried over from earlier derivative citizenship statutes predating the introduction of the term of art "lawful admission for permanent residence" in the 1952 INA, *see* Citizenship Act of 1907, ch. 2534, § 5, 34 Stat. 1228, 1229 (repealed 1940), Congress would not have intended "reside permanently" to be a shorthand for "lawful admission for permanent residence." Therefore, from the outset we presume that the terms have different meanings.

Second, the terms "lawful admission for permanent residence" and "reside permanently" have different meanings in the INA. The term "lawful admission for permanent residence" is explicitly defined as a particular legal status: "'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20); *see also Gooch v. Clark*, 433 F.2d 74, 78 (9th Cir. 1970) (describing "lawfully admitted for permanent residence" as a "term of art"). By contrast, the term "reside permanently" is not itself defined, although derivations of each word are defined separately. "The term 'permanent' means a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may

be dissolved eventually at the instance either of the United States or of the individual, in accordance with law." 8 U.S.C. § 1101(a)(31). "The term 'residence' means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent." *Id.* § 1101(a)(33). The definitions do not refer to a specific legal status or require lawful admission.

The term "reside permanently" appears elsewhere in the INA, but not as a synonym for "lawful admission for permanent residence." *See id.* § 1438 (describing a process by which a former U.S. citizen who had lost his or her citizenship by fighting for another country in World War II could regain citizenship if he or she "has been *lawfully admitted to the United States for permanent residence* and *intends to reside permanently* in the United States" (emphasis added)). Other INA provisions that were contemporaneous with § 1432(a) and have since been repealed used the terms as separate requirements, rather than one as a shorthand for the other. *See id.* § 1433(a)(5)(A) (1994) ("[T]he child is residing permanently in the United States with the citizen parent, pursuant to a lawful admission for permanent residence . . . ."); *id.* § 1431(a)(2) (1994) (providing for derivative citizenship for children born outside the United States of one citizen parent if they were "residing in the United States pursuant to a lawful admission for permanent residence at the time of naturalization or thereafter *and* begin[] to reside permanently in the United States while under the age of eighteen years" (emphasis added)).

Third, construing the second pathway to derivative citizenship as not requiring lawful permanent residence does not render either provision superfluous, as we suggested in *Romero-Ruiz*. *See* 538 F.3d at 1062 (referring to someone

who is "residing permanently" in the United States as someone "who otherwise meet[s] the requirements" of lawful permanent residency). The first pathway "addresses the class of minors who were 'lawfully admitted for permanent residence' at the time [their] parent was naturalized; they automatically derived citizenship upon the parent's naturalization." *Nwozuzu*, 726 F.3d at 329. The second pathway, on the other hand, "addresses minors who, at the time [their] parent was naturalized, either lived abroad or lived in the United States but had not been 'lawfully admitted for permanent residence.'" *Id.* These minors were subject to a different set of requirements, as they "did not derive citizenship automatically upon the parent's naturalization; rather, they derived citizenship automatically, but only after they resided in the United States *and* garnered some 'official objective manifestation' of their intent to reside permanently." *Id*. (emphasis in original).

Our interpretation is thus in perfect conformity with the "'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). Under our interpretation, each pathway applies *distinct* requirements to *distinct* categories of children with *distinct* timing, and does so with "logical reason." *Nwozuzu*, 726 F.3d at 331. It is not a "significant surplusage problem" that "a child otherwise meeting the qualifications becomes a citizen if he is residing in the United States as a legal permanent resident at the time of his parent's naturalization *or* if he is residing permanently in the United States (regardless of legal status) at the time of the naturalization." *Romero-Ruiz*, 538 F.3d at 1062 (emphasis in original).

Rather, that is likely the very framework that Congress intended, one that addresses the dual objectives of administrative efficiency[3] and family unity within our immigration system. *See Stone v. INS*, 514 U.S. 386, 398 (1995) (noting the "[u]nderlying considerations of administrative and judicial efficiency" in the INA); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 472 (D.C. Cir. 1995) ("In originally enacting the INA, Congress implemented the underlying intention of our immigration laws regarding the preservation of the family unit." (quotation marks, citation, and alteration omitted)), *vacated on other grounds*, 519 U.S. 1 (1996).[4]

---

[3] As the Second Circuit explained in *Nwozuzu*, "[r]equiring lawful admission for permanent residence at the time of the parents' naturalization [under the first pathway] provided an administratively convenient way of determining which children intended to remain with their parents and thus would become citizens at the time their parents were naturalized." 726 F.3d at 331. On the other hand, "[i]mposing such a requirement on minor children either living abroad or residing temporarily in the United States at the time of their parents' naturalization . . . would have been a meaningless formality," given that "children in this situation automatically acquired citizenship once they were residing in the United States and demonstrated their objective intent to remain 'permanently.'" *Id.* at 331–32. Requiring lawful admission for permanent residence under the second pathway "also would have unnecessarily delayed their entry into the country, making it difficult to begin to reside permanently in the United States while under the age of eighteen years and jeopardizing their chances of deriving citizenship from their parents. Congress clearly intended a different result." *Id.* at 332 (quotation marks and citation omitted).

[4] Our surplusage analysis in *Romero-Ruiz* also assumed that everyone who has lawful permanent residency must necessarily also be residing permanently in the United States, and therefore, if the phrases did have different meanings, the second provision would swallow the first. *See* 538 F.3d at 1062–63; *see also Cheneau*, 971 F.3d at 973–74 (Bennett, J., concurring). However, that is not necessarily so. Someone with lawful

By contrast, reading the statute to require lawful permanent resident status for both pathways such that "[t]he phrase 'or thereafter begins to reside permanently' alters only the *timing* of the residence requirement," *Romero-Ruiz*, 538 F.3d at 1062 (emphasis in original), is unlikely what Congress intended. As the *Cheneau* concurrence observed, if both pathways required lawful permanent residency, "it is

---

permanent resident status may not permanently reside in the United States within the meaning of the INA, for example. *See, e.g.*, *Gooch*, 433 F.2d at 76, 79 (holding that "green card commuters" can be lawfully admitted for permanent residence despite physically residing in Canada or Mexico and crossing the border to work).

The reverse is also true: an individual may reside permanently in the United States without lawful permanent resident status. In *Nwozuzu*, the Second Circuit observed that "there are a number of groups that are permitted to stay in this country permanently without being lawful permanent residents, including crewm[e]n on fishing vessels and nonimmigrant alien students (G-4 visa holders)." 726 F.3d at 333. The Government disputes the characterization, arguing that no one can lawfully "reside permanently" in the United States without lawful permanent resident status, noting that alien seamen "must adhere to the conditions of their non-immigrant status [and] do not have permission to reside permanently in the United States for as long as they may like outside of their employment." However, this argument applies a different understanding of the word "permanent" than the INA does. *See* 8 U.S.C. § 1101(a)(31) ("[A] relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law."). Under this definition, even if a G-4 visa holder, for example, is still subject to the terms of their visa requirements and their presence "may be dissolved," they still fall within the INA's definition of "permanent." *See Elkins v. Moreno*, 435 U.S. 647, 666–67 (1978) ("Of course, should a G-4 alien terminate his employment with an international treaty organization, both he and his family would lose their G-4 status. Nonetheless, such an alien would not necessarily be subject to deportation nor would he have to leave and re-enter the country in order to become an immigrant." (citation omitted)). Thus, we agree with Cheneau that the "categories" do not completely "overlap."

difficult to imagine why Congress would write two provisions that use different words but mean the same thing, when it could have written one provision along the lines of 'pursuant to a lawful admission for permanent residence at the time of naturalization or thereafter.'" 971 F.3d at 974 (Bennett, J., concurring); *see, e.g.*, 8 U.S.C. § 1431(a)(2) (1994) (granting derivative citizenship to children who satisfy certain requirements, including "residing in the United States pursuant to a lawful admission for permanent residence at the time of naturalization *or thereafter*" (emphasis added)).

Finally, Congress's decision to eliminate the "reside permanently" pathway and narrow the availability of derivative citizenship in 2000 indicates that the previous version of the statute was broader. Congress revised the derivative citizenship statute in 2000 to include three preconditions for derivative citizenship: (1) one parent is a citizen; (2) the child is under 18 years old; and (3) "[t]he child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence." 8 U.S.C. § 1431(a); *see* Child Citizenship Act of 2000, Pub. L. No. 106-395, 114 Stat. 1631, 1631–33. The 2000 revision eliminated any alternate pathway for individuals "residing permanently" in the United States. Standing alone, this revision may not compel the conclusion that Congress intended to limit derivative citizenship in the former statute to lawful permanent residents in the subsequent statutes. Combined with the other evidence that "lawful admission for permanent residence" and "reside permanently" have different meanings, however, Congress's revision was likely a conscious choice to eliminate one pathway and require lawful permanent residency for all claims to derivative citizenship.

B

The history of the INA and previous naturalization statutes further buttresses our conclusion that Congress intended "reside permanently" and "lawful admission for permanent residence" to have different meanings. *See generally Nwozuzu*, 726 F.3d at 329–32 (discussing the statutory history of the derivative citizenship provision). The statute carried over the language of "reside permanently" from prior naturalization laws, while adding the new term of art of "lawful admission for permanent residence."

In 1907, Congress first incorporated the "reside permanently" language into the derivative citizenship statute. *See* Citizenship Act of 1907, ch. 2534, § 5, 34 Stat. 1228, 1229 (repealed 1940) (providing for derivative citizenship of a child after "such minor child begins to reside permanently in the United States"). The next major revision in the Nationality Act of 1940 separated out the two pathways for citizenship and continued the use of that language: a child could derive citizenship if she either was "residing in the United States at the time of the naturalization of the parent," or "thereafter beg[an] to reside permanently in the United States while under the age of eighteen." Ch. 876, § 314(e), 54 Stat. 1137, 1146 (repealed 1952).

In 1952, the INA established lawful permanent residency as a term of art describing a new legal status. *See* H.R. Rep. No. 82-1365, at 32 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1684 (describing "lawfully admitted for permanent residence" as a term with "especial significance because of its application to numerous provisions of the bill"). In the INA, Congress established the statute in the form that it remained until 2000, adding in a requirement for "lawful admission for

permanent residence" in the first pathway. INA, ch. 477, § 321, 66 Stat. 163, 245 (1952) (codified as amended at 8 U.S.C. § 1432(a)(5) (1994)) (repealed 2000). At the time, a Senate Report described the addition of such language to be a "minor change[] in the law relating to derivative citizenship," S. Rep. No. 81-1515, at 712–13 (1950), but a change nonetheless—not a simple rewording of a "reside permanently" requirement in prior iterations of the derivative citizenship statute. And although a Senate subcommittee initially contemplated applying that change to "all persons taking citizenship derivatively," *id.* at 713, this change was not enacted. Congress's ultimate decision to maintain two separate pathways and only add this new term of art to one of them supports the conclusion that Congress did not intend for lawful permanent resident status to be a prerequisite to both pathways, especially given the choice to retain the preexisting precondition for derivative citizenship that did not require lawful permanent residence.

Thus, our interpretation of "reside permanently" is not "ahistorical." We disagree with the dissent that there is "significant evidence that the statutory phrase required then, and requires now, that a child have lawful permission to reside here permanently to secure derivative citizenship." Our construction is not contrary to the opinions, administrative decisions, and treatises interpreting the phrase in the 1907 and 1940 Acts, as the dissent suggests. Notably, not one cited opinion, decision, or treatise, held that a child needed lawful permission to reside in this country permanently to derive citizenship from his parents. Rather, all of the cited precedent held only that a child's *entry* must have been lawful, and that was the basis for holding that they were not lawfully admitted for permanent residence. *See Kaplan v. Tod*, 267 U.S. 228, 229 (1925) (child was ordered

excluded before ever entering the country); *Zartarian v. Billings*, 204 U.S. 170, 172 (1907) (child was "debarred from landing" before ever entering the country); *Schneider v. U.S. INS*, 65 F. Supp. 377, 380 (W.D. Wash. 1946), *aff'd*, 161 F.2d 1022 (9th Cir. 1947) (child did not have a "legal entry" because the INS failed to record his entry); *United States ex rel. Garos v. Reimer*, 24 F. Supp. 869, 869–70 (S.D.N.Y. 1938) (child's mother lied on his behalf in his initial visa application), *aff'd*, 97 F.2d 1019 (2d Cir. 1938); *Matter of C—*, 8 I. & N. Dec. 421, 421 (BIA 1959) (child was mistakenly admitted without a United States passport or an immigration visa); *Matter of M—*, 3 I. & N. Dec. 815, 816 (BIA 1949) (child was mistakenly admitted under a provision that did not apply to her).

Therefore, the "tenet[] of statutory interpretation" that "repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well" does not apply, because none of the administrative or judicial interpretations preceding the 1952 Act had "settled" whether "reside permanently" could mean lawfully residing on a temporary visa with the intent to remain permanently.[5] Cheneau's entry

---

[5] The same 1952 Senate Report discussed earlier also describes the history of derivative citizenship statutes, stating: "Lawful permanent residence has always been a prerequisite to derivative citizenship," and further explaining that "[t]here must be a bona fide *intent* to reside permanently in the United States." S. Rep. No. 81-1515, at 707 (1950) (emphasis added). In the previous paragraph, the Report details the same predecessor statutes we mention, each of which is presence-based rather than status-based. *See id.* at 706 (referencing *inter alia* the Citizenship Act of 1907 and the Nationality Act of 1940). This context further indicates that the meaning of "lawful permanent residence" in this sentence may have meant lawful residence with an intent to remain

was lawful, and he intended to reside permanently, so it is not "ahistorical" to conclude that he "resided permanently" in the United States prior to turning eighteen for purposes of deriving citizenship from his mother.

IV

Even though the second pathway to derivative citizenship does not require lawful permanent residence under the former statute, we agree with the Second Circuit in *Nwozuzu* that, to satisfy the "reside permanently" requirement in the second pathway, an individual must demonstrate "some objective official manifestation of the child's permanent residence." 726 F.3d at 333 (citation omitted). Such a measure ensures that an applicant is genuinely complying with the "reside permanently" requirement. The rule proposed by the dissent involves reading other language into the statute. The word "lawful" is conspicuously absent from the second pathway. While we interpret the words that *are* in the statute—"reside permanently"—the dissent would have us impose a substantive requirement that Congress clearly did not include in the second pathway—"lawful" permanent residence. We cannot go so far. *See United States v. Jackson*, 390 U.S. 570, 580 (1968) ("It is one thing to fill a minor gap in a statute—to extrapolate from its general design details that were inadvertently omitted. It is quite another thing to create from whole cloth a . . . completely novel [requirement] . . . .").

Here, Cheneau filed an application for adjustment of status to lawful permanent resident status after his mother naturalized, expressing his intent to reside permanently in the

permanently, and at the very least it does not demonstrate that the meaning is "settled" to the contrary.

United States.  *See Cheneau*, 971 F.3d at 966; *see also Nwozuzu*, 726 F.3d at 334 ("[Nwozuzu's] application of adjustment to lawful permanent resident status . . . is an objective and official manifestation of his intent to reside permanently in the United States.").[6]

V

In sum, the *Cheneau* panel properly concluded that it was bound under circuit precedent by *Romero-Ruiz*.  The panel then properly highlighted the problems in applying the *Romero-Ruiz* analysis of § 1432(a)(5) in the present context. In reconsidering *Romero-Ruiz*, we agree with Judge Bennett's concurring opinion that *Romero-Ruiz* must be overruled to the extent that it interpreted "reside permanently" to require lawful permanent resident status.  Instead, we conclude that the second pathway to derivative citizenship under the former statute requires that an applicant demonstrate an objective official manifestation of permanent residence, such as applying for adjustment of status to lawful permanent resident status.  However, with that correction, *Romero-Ruiz* in all other respects remains good law.

---

[6] Conversely, although Romero-Ruiz filed an application for adjustment of status, he abandoned that application when he departed the country knowing that he needed to remain in the United States while his application was pending.  *See Romero-Ruiz*, 538 F.3d at 1060. Furthermore, unlike Cheneau, Romero-Ruiz unlawfully *entered* the United States.  *Id.*  Even under the rule we establish today, Romero-Ruiz would not have been entitled to derivative citizenship under the second pathway.

We thank the panel for calling the issue to the attention of the Court, and we remand this case to the three-judge panel for its analysis of the merits under the revised rule.[7]

**REMANDED**.

---

BRESS, Circuit Judge, with whom HUNSAKER, BUMATAY, and VANDYKE, Circuit Judges, join, dissenting:

Monssef Cheneau is potentially removable from the United States, but only if he did not become a United States citizen as a result of his mother naturalizing—known in immigration law as "derivative citizenship." An earlier version of the derivative citizenship statute provided that a child secures U.S. citizenship when, after his parent

---

[7] We recognize that this case involves a statute that has been repealed and will not affect many cases. As the Government observed, "litigation regarding § 1432(a)(5) is not widespread, and will continue to diminish with the passage of time." We also recognize that, not only is litigation concerning this issue "not widespread," but that this case involves relatively unique circumstances. It is striking how many events had to align at particular times and in a particular order for Cheneau to qualify as a derivative citizen under § 1432(a)(5): He lawfully entered the United States at age thirteen, intending to remain permanently in the country. His mother naturalized while he was under eighteen. He objectively and officially manifested his intent to reside permanently in the United States by filing an adjustment of status application before he turned eighteen. And all of this occurred before the statute was repealed in 2000. Nonetheless, it is important for resolution of this case, and the relatively few cases involving similar circumstances, for us to apply the proper statutory analysis and to apply a correction to the relevant portion of *Romero-Ruiz*.

naturalizes, he "begins to reside permanently in the United States while under the age of eighteen years."  8 U.S.C. § 1432(a)(5) (1994) (repealed 2000).  Does "reside permanently" mean *lawful* permanent residence?  Or does "reside permanently" merely mean some degree of "permanent" physical presence in the United States?  Or could it mean something else?

We had previously adopted the first interpretation, holding that any different reading was not only incorrect but in fact "unreasonable and contrary to the natural reading of the language."  *Romero-Ruiz v. Mukasey*, 538 F.3d 1057, 1062 (9th Cir. 2008).  Nothing has changed since we decided *Romero-Ruiz*, which our fine Chief Judge also authored.  Yet the Court's en banc decision today now adopts the very "unreasonable" reading of the statute that *Romero-Ruiz* rejected.

I think our Court got it right the first time.  The Court's new interpretation is an untenable construction of the statutory text.  Nor does it account for decades of statutory history in which derivative citizenship necessarily required lawful permission to reside permanently in the United States—the legal backdrop against which the statutory language "reside permanently" has long existed in our immigration law.  The majority's reading also produces significant problems of practical administration, creating confusion as to who qualifies for derivative citizenship while extending derivative citizenship without authorization to a potentially wide range of additional people.  That would include people like the petitioner in this case, who committed crimes in this country and who might otherwise be removable.

It is tempting to think that because this case involves a prior version of the derivative citizenship statute no longer on the books, the implications from today's ruling should be limited. I hope that is the case, but I am concerned it won't be. The statute in question was in place from 1952 to 2000, and the statutory language at issue goes back to 1907. Millions of persons have become naturalized U.S. citizens over those many decades. And if they had children born abroad, those children (now adults) will potentially be derivative U.S. citizens. I do not believe Congress licensed the novel pathway to citizenship that the Court announces today, much less the indeterminate inquiries that may now need to be undertaken to determine who is a derivative U.S. citizen, and thus who is entitled to the valuable rights and privileges that citizenship confers.

These and other reasons cause me to conclude that Cheneau did not become a derivative citizen and thus may be removable. I therefore respectfully dissent.

## I

Mr. Cheneau entered the United States in 1998 at age 13 on a non-immigrant student visa. He applied for adjustment of status in 2000, at age 15, but did not become a lawful permanent resident until 2003, after turning 18. His mother, who had full legal custody of Cheneau, naturalized in 1999. Starting in 2006, Cheneau was convicted of various crimes. The United States seeks to remove him for that misconduct. If Cheneau gained derivative citizenship, however, that is not an option.

But is Cheneau a U.S. citizen? "[D]erivative citizenship is determined under the law in effect at [the] time the critical

events giving rise to eligibility occurred." *Minasyan v. Gonzales*, 401 F.3d 1069, 1075 (9th Cir. 2005). If the "critical event" was Cheneau becoming a lawful permanent resident in 2003 after he turned 18, then it is undisputed Cheneau is not a U.S. citizen. *See* 8 U.S.C. § 1431(a) (allowing derivative citizenship only for children under 18 who were lawful permanent residents as minors). That was what the panel originally held, in reliance on *Romero-Ruiz*. *See Cheneau v. Barr*, 971 F.3d 965, 969–70 (9th Cir. 2020) (per curiam).

But if the "critical event" is instead Cheneau applying for adjustment of status in 2000, we would have to consider a different, now repealed section of the Immigration and Nationality Act (INA). Under that provision, which was in place after Cheneau's mother naturalized and before Cheneau turned 18, a child born outside this country may obtain derivative citizenship based on a parent's naturalization, if:

> Such child [1] is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent . . . or [2] thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a)(5) (1994) (repealed 2000). Cheneau is not eligible under the first clause: he had not attained lawful permanent resident status "at the time" his mother naturalized in 1999. But Cheneau argues, and the majority agrees, that Cheneau satisfies the second clause.

In the majority's view, it is sufficient for purposes of the second clause that Cheneau "demonstrated an objective

official manifestation of permanent residence." I respectfully disagree. Even if that is a potentially sound rule that one might enact—and I seriously question whether it is, for reasons I explain below—the statute lacks this language. But to even get to the majority's new refinement, one must first conclude, as the majority does, that "reside permanently" does not mean permanent residence on a *lawful basis*. That is the seed of the majority's mistaken interpretation.

The majority opinion focuses heavily on the fact that "Congress chose to use two different terms in the statute": "lawful admission for permanent residence" in the first clause, but "reside permanently" in the second. From there the majority presumes that the terms have different meanings, because "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) (quotations omitted). The majority thus holds that under § 1432(a)(5)'s second clause, Cheneau was eligible for derivative citizenship even though he did not become a lawful permanent resident before turning 18.

The presumption that different statutory phrases have different meanings is, of course, a valid one, although that presumption would seem to have somewhat less force when, as here, the difference between the two phrases is not particularly dramatic. Even so, the presumption that the majority employs, "like other canons of construction, is no more than a rule of thumb that can tip the scales when a statute could be read in multiple ways." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 156 (2013) (quotations and alterations omitted).

Here, we must weigh any presumption that different phrases have different meanings alongside other relevant tenets of statutory interpretation. One is that "[w]hen administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998). Another is that "[s]tatutory language cannot be construed in a vacuum" because "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) (quotations omitted). That canon is itself key to another "cardinal principle," which is that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quotations omitted).

Applying these principles shows that the majority's interpretation is unsound. I will begin with the statutory history, turn next to the statutory language at issue, and then return to the history.

A

The derivative citizenship statute we consider in this case is a historical artifact that contains a particular phrase—"reside permanently"—with a recognized legal heritage. That phrase did not come out of the ether: it was used in the derivative citizenship statute for nearly 100 years. There is significant evidence that the statutory phrase required then, and requires now, that a child have lawful permission to reside here permanently to secure derivative

citizenship. The majority's interpretation of the phrase "reside permanently" is ahistorical, neglecting to account for the fact that the phrase was traditionally understood in this context to require lawful permanent residence.

1

The relevant history begins in the early part of the twentieth century. Although § 1432(a)(5) was adopted in 1952, the phrase "reside permanently" has been part of the derivative citizenship statute since 1907. Act of Mar. 2, 1907, ch. 2534, § 5, 34 Stat. 1228, 1229. The 1907 Act provided that "[t]he citizenship of such minor child shall begin at the time such minor child *begins to reside permanently* in the United States." *Id.* (emphasis added).

Relevant to our interpretation of this same phrase in later iterations of the statute, there is considerable evidence that "reside permanently" was understood to require lawful permanent residence: "[o]ne of the conditions [of the 1907 Act] is that such minor child shall have a lawful permanent residence in this country." *United States ex rel. Garos v. Reimer*, 24 F. Supp. 869, 870 (S.D.N.Y. 1938), *aff'd*, 97 F.2d 1019 (2d Cir. 1938); *see also id.* ("[T]he difficulty is that the relator never lawfully acquired a permanent residence in the United States which was an essential requisite under section 5 [of the 1907 Act]. He was never lawfully admitted for permanent residence.").

As one treatise thus explains:

> All statutes regarding derivative naturalization . . . have been interpreted to require a lawful admission before the child would be

considered to have been 'dwelling' or 'residing lawfully' in the United States. . . . [T]he requirement of lawful admission to permanent residence has been adopted, at least for the purposes of the post-1907 statutes. . . . A person does not derive citizenship even when at the time of his or her original entry, he or she was eligible for lawful permanent resident status and failed to obtain it through no fault of his or her own.

U.S. Citizenship and Naturalization Handbook § 5:8 (2020) (citing cases); *see also Matter of C—*, 8 I. & N. Dec. 421, 422 (BIA 1959) (explaining that "[l]awful permanent residence has always been a prerequisite to derivative citizenship" (quoting S. Rep. No. 81-1515, at 707 (1950))). Another treatise similarly explains that to gain derivative citizenship, "[l]egal entry must be strictly complied with. Mere physical presence or temporary entrance by permission is not legal entry nor legal residence for the purpose of acquiring citizenship." Sidney Kansas, U.S. Immigration: Exclusion and Deportation and Citizenship of the United States of America 345 (1940); *see also* Sidney Kansas, Citizenship of the United States of America 81–82 (1936) (same).

In 1940, Congress repealed and replaced the derivative citizenship provisions. Nationality Act of 1940, ch. 876, § 504, 54 Stat. 1137, 1172–74. Like § 1432(a)(5), the 1940 Act broke things down based on the timing of the child's residence in the United States as compared to the timing of the parent's naturalization. Thus, under the 1940 Act, a child would gain derivative citizenship if he: "[1] resid[ed] in the United States at the time of the naturalization of the parent last naturalized . . . or [2] thereafter begins to reside

permanently in the United States while under the age of eighteen years." Nationality Act of 1940, ch. 876, § 314, 54 Stat. 1137, 1145–46. The second clause, one will observe, carries forward the "reside permanently" language from the 1907 Act and is identical to the clause we are required to interpret in this case. *See* 8 U.S.C. § 1432 (a)(5) (1994) (repealed 2000).

There is substantial evidence that this section of the 1940 Act, irrespective of the two clauses, was also generally understood to require permanent residence on a lawful basis. *See Matter of C—*, 8 I. & N. Dec. at 422 (finding that a child who lived in the United States did not gain derivative citizenship under the 1940 Act because "[l]awful permanent residence has always been a prerequisite to derivative citizenship . . . [so] [e]ven though an alien may reside physically within the United States, if he be in an excluded class, such residence cannot be considered as a permanent residence" (citations omitted)); U.S. Citizenship and Naturalization Handbook § 5:15 (2020) (under the 1940 Act, a "child would not derive citizenship unless both the naturalization of the parent or parents and the child's lawful permanent residence occurred before the child turned eighteen years of age").

Indeed, there is good reason to believe that the second provision in the 1940 Act in particular required lawful permanent residence as a condition for children who sought derivative citizenship after a parent had naturalized. Besides using the same "reside permanently" language that had long been understood to require *lawful* permanent residence, the explanation also lies in how the 1940 Act distinguished between immigrants and nonimmigrants.

While the Nationality Act of 1940 was in place, Congress classified aliens as immigrants or nonimmigrants. *See* S. Rep. No. 81-1515, at 414, 612 (1950).[1]  Immigrants were those "coming to this country for permanent residence." *Id.* at 612; *see also id.* at 414, 618; Immigration Act of 1924, ch. 190, § 3, 43 Stat. 153, 154–55.  Nonimmigrants, in contrast, could only reside here temporarily and could not gain citizenship.  S. Rep. No. 81-1515, at 414, 612 (1950); *United States v. Kwan Shun Yue*, 194 F.2d 225, 228 (9th Cir. 1952) ("Only those entering as immigrants establish formal residence and gain eligibility to citizenship.").  Conversely, a person who was an immigrant, and who thus "ha[d] a record of admission for permanent residence," could be eligible for citizenship.  S. Rep. No. 81-1515, at 732 (1950); *see also* 8 C.F.R. §§ 363.1, 363.3–.4 (1949).

This meant that a child seeking derivative citizenship "was required to be in possession of a valid immigration visa to be lawfully admitted for permanent residence." *Matter of C—*, 8 I. & N. Dec. at 422.  A child who was not "lawfully admitted into the United States for permanent residence[] . . . [l]ack[ed] this essential element" and thus could "not derive citizenship." *Id.* at 423; *see also* S. Rep. No. 81-1515, at 709 (1950) (noting that a child could gain citizenship after the death of a parent if all the 1940 Act's "conditions are fulfilled," which included "lawfully residing permanently in the United States"); Marian Schibsby & Read Lewis, How to

---

[1] Here I use a Senate Report not as an authoritative indicator of legislative intent but because this Senate Report provides a useful description of the statutory history for derivative citizenship, much like a learned secondary source.  *See* S. Rep. No. 81-1515, at 1 (1950) (describing how the Senate commissioned the report as "a full and complete investigation of [the] entire immigration system").

Become a Citizen of the United States 51–52 (1959) (under the 1940 Act, a "child did not derive American citizenship through the naturalization of its parents unless both parents were American citizens before the child reached the age of 18 and the child was legally admitted to the United States for permanent residence before [he] was 18").

The majority errs in relying on cases from before 1952 in suggesting that derivative citizenship turned on whether a child's initial entry into the United States was lawful. These cases merely show that legal entry was *necessary* for derivative citizenship. But they also have language and reasoning supporting my view that legal entry was not *sufficient* to derive citizenship because what was required was lawful permission to remain here permanently. *See, e.g.*, *Reimer*, 24 F. Supp. at 870 (the child did not derive citizenship because "[h]e was never lawfully admitted for permanent residence," "which was an essential requisite"); *Matter of M—*, 3 I. & N. Dec. 815, 816 (BIA 1949) ("[L]awful admission for permanent residence[] . . . is required in order for [the] subject to establish that she derived citizenship."); *Matter of C—*, 8 I. & N. Dec. at 423 (the child did not derive citizenship because he did not meet requirements to "presume[] a lawful admission for permanent residence"). That is what all the treatises and other secondary sources I have cited say as well, confirming a commonly shared understanding at the time. The majority, meanwhile, identifies no case, treatise, or any other source endorsing its theory that, before 1952, a child could be present here on a temporary basis (such as a student visa) and from there make the immediate leap to derivative United States citizenship through a naturalized parent.

2

The 1952 Act bears out my view of the history. When Congress enacted the INA in 1952, it repealed the Nationality Act of 1940. Immigration and Nationality Act, ch. 477, § 403(a)(42), 66 Stat. 163, 279 (1952). Before the INA, a nonimmigrant temporarily residing in the United States generally could not adjust his status to residing permanently within the United States; he "had to leave the country and apply for an immigrant visa at a consulate abroad." *Elkins v. Moreno*, 435 U.S. 647, 667 (1978); *see also Landin-Molina v. Holder*, 580 F.3d 913, 915–16 (9th Cir. 2009) (describing this statutory history); S. Rep. No. 81-1515, at 591 (1950) (nonimmigrants "may not change from a temporary status to the status of an immigrant for permanent residence" inside the country).

To address this issue, Congress in 1952 introduced the formal term "lawful permanent residence" as part of a broader overhaul of the immigration laws that allowed persons to adjust to legal permanent residency from within the United States, rather than outside it. *See Elkins*, 435 U.S. at 667; *Landin-Molina*, 580 F.3d at 916. To account for this change, Congress amended the first clause of the derivative citizenship provision to require that the child be "residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent." 8 U.S.C. § 1432(a)(5) (1952) (repealed 2000).

The majority seizes on this new statutory language to suggest that the long-used phrase "reside permanently" must mean something different under the 1952 Act than "lawful admission for permanent residence." But the history tells us otherwise. There is, as I have discussed, considerable

evidence that the 1940 Act (and its predecessor) had generally been understood to contain a lawful permanent residence prerequisite. So when Congress in 1952 adopted the term "lawful admission for permanent residence," that as a general matter reflected a "codification of court decisions denying naturalization to those who entered illegally or on temporary visas." *Developments in the Law—Immigration and Nationality*, 66 Harv. L. Rev. 643, 713 (1953).

Contrary to what the majority suggests, Congress did not need to make similar changes to § 1432(a)(5)'s second clause, which applied to children who began to "reside permanently" in the United States after their parents had naturalized. As I explain below in detail, as a textual matter, it was clearly sufficient for Congress to insert the phrase "lawful admission for permanent residence" only into the first clause of § 1432(a)(5) because under basic principles of statutory construction, the statute is most naturally read as extending that requirement to the second clause as well. Otherwise, the first clause is entirely, or almost entirely, superfluous. Even so, it was unnecessary for Congress to add an explicit reference to "lawful admission for permanent residence" to the second clause if the second clause already embodied that concept, as the history suggests.[2]

---

[2] The First Circuit has suggested that the 1940 Act's first provision "apparently" did not require lawful permanent residence. *Thomas v. Lynch*, 828 F.3d 11, 16 & n.6 (1st Cir. 2016). The First Circuit did not explain the basis for that theory. But even if true, it at most suggests that Congress in 1952 increased the lawful permanent residency requirement for the first provision to align it with the second provision. The position that the majority adopts today means that under § 1432(a)(5), Congress in 1952 imposed *more* onerous requirements on children seeking to become derivative citizens at the time of their parents' naturalization than afterward. But as the First Circuit explained, "it is not at all clear why

Unsurprisingly, the 1952 Act was thus itself understood, consistent with its predecessors, to require lawful admission for permanent residence as a general requirement for derivative citizenship. *See, e.g.*, Schibsby, *supra*, at 52 (under the 1952 Act, "[t]he child must be residing in the United States—after being legally admitted for permanent residence—prior to his 16th birthday"); Frank L. Auerbach, The Immigration and Nationality Act: A Summary of Its Principal Provisions 70 (1953) (§ 1432(a)(5) requires that "the child is lawfully admitted to the United States for permanent residence at the time of the naturalization of the parent last naturalized or is lawfully admitted for permanent residence after the parent's or parents' naturalization while under sixteen years of age"); Sidney Kansas, Immigration and Nationality Act Annotated with Rules and Regulations 203 (1953) (under the 1952 Act, a child gains derivative citizenship "if he was lawfully admitted to the United States for permanent residence"). The majority opinion's re-interpretation of the 1952 Act is contrary to this long-held understanding.

The majority therefore errs in claiming that a Senate Report supports its interpretation of the 1952 Act. I do not believe it appropriate to use legislative history to ascertain legislative intent, but the majority's analysis should be unpersuasive even to those who do. Referencing the lawful permanent residence requirement in § 1432(a)(5)'s first clause, the majority concedes that the Senate Report recommended only "minor changes in the law relating to derivative citizenship." S. Rep. No. 81-1515, at 712 (1950).

---

Congress [in 1952] would have intended that result" if the 1940 Act instead made it harder to obtain derivative citizenship after a parent had naturalized. *Id.* at 16.

Yet the majority still infers from this that the prior statutes contained no lawful permanent residence requirement.

That inference is not warranted. The same Senate Report that the majority quotes also states that "[t]he subcommittee makes *no recommendations for substantial changes* in the law relating to derivative citizenship . . . ." *Id.* (emphasis added). And at other points, the Senate Report notes that "[l]awful permanent residence has always been a prerequisite to derivative citizenship," and that the 1952 Act would "[r]equire that all persons taking citizenship derivatively be residing in the United States pursuant to a lawful admission for permanent residence." *Id.* at 707, 713. The Senate Report therefore supports my view that irrespective of § 1432(a)(5)'s differing language across the two clauses, the 1952 Act was merely a continuation of prior law, which required lawful permanent residence to be eligible for derivative citizenship.

The majority, echoing the panel concurrence of our fine colleague Judge Bennett, thus errs in believing it is "difficult to imagine why Congress [in 1952] would write two provisions that use different words but mean the same thing, when it could have written one provision along the lines of 'pursuant to a lawful admission for permanent residence at the time of naturalization or thereafter.'" *Cheneau*, 971 F.3d at 974 (Bennett, J., concurring). Just as a painter need not start every new work from a clean canvas, Congress may add to what it has already created. In my view, that is the more probable explanation of what Congress did here. And it is understandable why it might have done so: such an approach can promote stability in the law when, as here, the statutory phrase had existed for decades.

I therefore do not think that treating § 1432(a)(5)'s second clause as requiring lawful permanent residence would reflect "a radical change" in the law. *Id.* at 976 (Bennett, J., concurring). From the perspective of the question at issue, the better view is that the 1952 Act worked no material change in the law, radical or otherwise. As we previously recognized, the 1952 Act in fact "affirmatively disclaimed any intention to change the existing law with respect to derivative citizenship." *Acevedo v. Lynch*, 798 F.3d 1167, 1171 (9th Cir. 2015) (quotations omitted). It is actually the majority opinion that creates a substantial change in the law, treating people as derivative citizens irrespective of whether they are permanently residing in the United States on a lawful basis and despite the crimes they have committed here.

B

The statutory history also helps us to understand why the majority's construction of the text is mistaken. A proper interpretation of the text leads to the same conclusion as the statutory history suggests: lawful permanent residence is a prerequisite for derivative citizenship under § 1432(a)(5).

Again, under the provision as it existed at the relevant time for Mr. Cheneau, a child born outside this country could obtain derivative citizenship based on a parent's naturalization, if:

> Such child [1] is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent . . . or [2] thereafter begins to reside

permanently in the United States while under
the age of eighteen years.

8 U.S.C. § 1432(a)(5) (1994) (repealed 2000).

Given the history I have set forth above, it makes sense to read "reside permanently" as meaning "reside permanently with lawful permission to do so." "[C]ourts presume that Congress will use clear language if it intends to alter an established understanding about what a law means; if Congress fails to do so, courts presume that the new statute has the same effect as the older version." *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 988 (7th Cir. 2001); *see also Bragdon*, 524 U.S. at 645; *Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554, 562 (1991). Nothing in the language Congress put into law in 1952 suggested any intention to depart from preexisting law on whether derivative citizenship required the child to be permanently present in the United States on a lawful basis.

But one need not agree with me on the history to see that the majority's interpretation is mistaken. Focusing only on the language of § 1432(a)(5) abstracted from its historical moorings, the reason the majority's interpretation is wrong as a textual matter is that if "reside permanently" in § 1432(a)(5)'s second clause does not mean *lawful* permanent residence, then § 1432(a)(5)'s first clause is effectively a nullity. This is precisely why our prior decision in *Romero-Ruiz* rejected the majority's current interpretation as "unreasonable and contrary to the natural reading of the language." 538 F.3d at 1062. As *Romero-Ruiz* explained, "[t]o interpret the second clause as conferring derivative citizenship on children who otherwise meet the requirements as long as they are permanently living in the United States would render the first clause—requiring legal permanent

residence—superfluous." *Id.* That reasoning was right on the mark.

Section 1432(a)(5)'s first clause confers derivative citizenship if the child "is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent." As the Board of Immigration Appeals has explained, under the majority's interpretation, "[a]n alien would rarely if ever need to be 'residing in the United States pursuant to a lawful admission for permanent residence' because he or she could simply show that some lesser form of residence was 'thereafter' acquired before the alien reached the age of 18." *Matter of Nwozuzu*, 24 I. & N. Dec. 609, 614 (BIA 2008). A child who did not have lawful permanent residence "at the time" his parent naturalized and who was thus ineligible for derivative citizenship under § 1432(a)(5)'s first clause could wake up the morning after his parent naturalizes and be a derivative citizen under the second clause.

It is hard to imagine why Congress would have made it harder for a child to gain citizenship at the time his parents naturalized than it would afterward. *See Thomas*, 828 F.3d at 16. And it is equally hard to imagine that Congress intended such easy evasion of the lawful permanent resident requirement in § 1432(a)(5)'s first clause. That significant surplusage problem thus makes the majority's interpretation "contrary to the natural reading of the language." *Romero-Ruiz*, 538 F.3d at 1062. It also counsels heavily in favor of reading "resides permanently" to mean lawful permanent residence, a meaning it can easily bear (and that finds support in the statutory history).

The majority cannot overcome the "unreasonable" surplusage that its interpretation generates. *Romero-Ruiz*, 538 F.3d at 1062. The majority claims there is no superfluity problem because under its interpretation, "each pathway applies *distinct* requirements to *distinct* categories of children with *distinct* timing." But that merely restates the rule the majority is trying to prove. That each of the majority's "pathways" contains "distinct requirements" does not demonstrate that the second pathway would not make the first one irrelevant.

The majority's only attempt to demonstrate otherwise is buried in a lengthy footnote. Contrary to what we said in *Romero-Ruiz*, the majority now concludes that its reading does "not necessarily" create a surplusage problem because "[s]omeone with lawful permanent residence may not permanently reside in the United States within the meaning of the INA." The majority gives as its example "green card commuters" who "can be lawfully admitted for permanent residence despite physically residing in Canada or Mexico and crossing the border to work." But this example only confirms the depth of the surplusage problem that the majority opinion creates.

It is true that those with lawful permanent resident status, such as green card commuters, may live outside this country and not necessarily reside in the United States. But § 1432(a)(5) is a statute about citizenship. And § 1432(a)(5)'s first clause provides derivative citizenship to children "*residing in the United States* pursuant to a lawful admission for permanent residence." The majority does not explain how a child permanently residing *outside* the United States would even qualify for derivative citizenship. Congress enacted § 1432 "to ensure that only those alien

children whose 'real interests' were located in America with their custodial parent, and not abroad, should be automatically naturalized." *Nehme v. INS*, 252 F.3d 415, 425 (5th Cir. 2001).  It is hard to see how that interest is served (or the statute satisfied) by granting derivative citizenship to a child who does not even permanently reside in the United States with his naturalized parent.  *See also Cheneau*, 971 F.3d at 973 (Bennett, J., concurring) (explaining that § 1432(a)(5)'s first clause "imposes an actual residence requirement").

Of course, even if the majority's hypothetical scenario were possible under the statute, it is exceedingly unlikely to occur.  In the one example the majority gives, § 1432(a)(5)'s first clause but not the second would apply only to the negligible class of people (1) who are under 18 years old, (2) who do not live in the United States, (3) who happen to regularly commute to the United States for work, *see* 8 C.F.R. § 211.5, and (4) whose parent or parents became naturalized citizens.  This class is made even smaller considering that children below a certain age will not be regular workers.

The upshot is that even if the majority has shown there is some potential scenario in which its reading of § 1432(a)(5)'s second clause does not make the first clause entirely superfluous, that scenario is surely rare.  The linguistic and logical intuitions behind the canon against surplusage are not overcome simply because one can identify some highly unusual situation in which a statutory provision would technically remain operative.  *See TRW*, 534 U.S. at 29 (statutes should not be read to render a provision "entirely superfluous in all but the most unusual circumstances").  Whether the majority's reading of § 1432(a)(5)'s second clause results in a total or near total elimination of its first

clause, the majority's interpretation of "reside permanently" is unsound.[3]

The majority's other arguments are equally unpersuasive. The majority maintains that "the terms 'lawful admission for permanent residence' and 'reside permanently' have different meanings in the INA." But that again assumes the conclusion to the question we are trying to answer here.

As the majority acknowledges, although the phrase "lawful admission for permanent residence" is defined in the statute, the phrase "reside permanently" is not. The statute does separately define "permanent" and "residence," *see* 8 U.S.C. §§ 1101(a)(31), (33), as the majority points out. But we are not considering those terms individually (and the term "residence" is not even in the operative provision). We are instead evaluating a phrase—"reside permanently"—in both its textual and historical contexts. The question is thus whether, in the context in which it is used in § 1432(a)(5), "reside permanently" should be construed to mean *lawful* permanent residence. In this context, and to avoid making § 1432(a)(5)'s first clause nearly or completely unnecessary, it is better to read "reside permanently" as I do and as the history of this provision further supports.

---

[3] The majority also claims that "an individual may reside permanently in the United States without lawful permanent resident status." To support this point, the majority categorizes G-4 visa holders and seamen as residing permanently in the United States, even though they do not have lawful permanent resident status. The majority misstates these statutes. Both require employment for the person to continue to reside here, which an employer may end. *See* 8 U.S.C. § 1101(a)(15)(D), (a)(15)(G)(iv). These persons may not reside permanently in the United States irrespective of their employment. *See* 8 U.S.C. § 1101(a)(31). They are thus not permanent residents in any relevant sense.

The majority therefore errs in claiming that my interpretation "involves reading other language into the statute" because "[t]he word 'lawful' is conspicuously absent from the second pathway." That is a mischaracterization. My interpretation consists of giving meaning to a particular phrase—"reside permanently"—when that phrase is used in a particular textual setting and with a particular historical backdrop. Notably, the majority reads in a "lawfulness" requirement too, seemingly requiring that Cheneau's initial entry into the United States be "lawful." The difference, however, is that the majority's more limited "lawfulness" requirement has no basis in the structure or history of the statute. And the majority of course adds on top of that an "objective official manifestation" component that has no basis in the statute at all.

The majority similarly gets no mileage in pointing out that "[t]he term 'reside permanently' appears elsewhere in the INA, but not as a synonym for 'lawful admission for permanent residence.'" The examples the majority cites from other code provisions all have one thing in common: the phrase "reside permanently" is used in a provision that on its own *already* required lawful permanent residence. In those different contexts, "reside permanently" must therefore be performing a different function than it does in § 1432(a)(5)'s second clause.

Take for instance 8 U.S.C. § 1438. It provides that former U.S. citizens who lost their citizenship after fighting for allied countries during World War II could regain their citizenship if they had "been lawfully admitted to the United States for permanent residence *and* intend[] to reside permanently in the United States." 8 U.S.C. § 1438(b)(2) (emphasis added). In this context "reside permanently"

creates an additional, domicile-type requirement beyond lawful permanent resident status.  The same is true of the other provisions the majority cites.  *See id.* § 1431(a)(2) (1994); *id.* § 1433(a)(5)(A) (1994).

What this at most proves is that like most statutory phrases (especially undefined ones), the phrase "reside permanently" can have different meanings depending on the context in which it is used.  If it is in a statutory provision as an *additional requirement* to lawful permanent resident status, as in the majority's examples, we should not interpret it to *mean* lawful permanent resident status, or else we would be making parts of the provision surplusage.  But in this case, § 1432(a)(5)'s two clauses are separated by an "*or*," not an "*and*," and reading "reside permanently" as a domicile-type requirement only, as the majority does, makes the first provision entirely or almost entirely unnecessary.  That was our core holding in *Romero-Ruiz*, with which the Eleventh Circuit has since agreed.  *See United States v. Forey-Quintero*, 626 F.3d 1323, 1326–27 (11th Cir. 2010).

Section 1432(a)(5)'s two clauses thus work together but apply to two different circumstances.  The first clause applies to children who are lawful permanent residents "at the time" their parent naturalizes; the second clause applies to children who become lawful permanent residents after their parent naturalizes.  As we explained in *Romero-Ruiz*, "[a] plain reading of the statute evidences the requirement that the child be residing pursuant to lawful admission either at the time of the parent's naturalization or at some subsequent time while under the age of 18.  The phrase 'or thereafter begins to reside permanently' alters only the *timing* of the residence requirement, not the requirement of *legal* residence." 538 F.3d at 1062.

Is this the only way the statute could have been drafted to accomplish this result? No—there are of course other ways it could have been written. Perhaps it could have been written more clearly, although Congress might have thought it inadvisable (or unnecessary) to drop "reside permanently" from a statute that had used this language without apparent incident for decades. Even so, that Congress might have made our lives easier does not change the more natural meaning of the text it enacted.

That brings me back to the final piece of statutory history. In the Child Citizenship Act of 2000, Congress consolidated the derivative citizenship provisions into a single provision found at 8 U.S.C § 1431(a). Child Citizenship Act of 2000, Pub. L. No. 106-395, § 101, 103, 114 Stat. 1631, 1631–33. The new language provides that a child born outside the United States gains derivative citizenship "when all of the following conditions have been fulfilled:" (1) the parent is a citizen, "whether by birth or naturalization," (2) the child is under 18, and (3) "[t]he child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence." 8 U.S.C. § 1431(a).

Once again, the statute requires the child to have lawful permanent resident status before he turns 18. That is why, if the "critical event" for Cheneau's derivative citizenship is his becoming a lawful permanent resident, *Minasyan*, 401 F.3d at 1075, it is clear Cheneau is not a derivative U.S. citizen because he did not achieve this status until after his 18th birthday.

The majority agrees but concludes that Congress's 2000 revision "indicates that the previous version of the statute was

broader." There is no apparent basis for that assumption, which even the majority concedes does not, "[s]tanding alone," "compel" its interpretation. I think the better view is instead that the statute has long required a child to have permanent residency on a lawful basis, and so Congress's revisions in 2000 were merely a carry-over of previous law.

But on the majority's view, the 2000 amendment was instead a seismic shift in immigration law, upending a supposed understanding, persisting since at least 1952 (and maybe longer), that lawful permanent residency was *not* always a requirement for derivative citizenship. If that were the case, one would imagine significant evidence—in the legislative history, case law, commentary, or otherwise—discussing such a foundational change in how children may become citizens. But the majority cites no such evidence and neither does Cheneau.

In fact, as to other aspects of child citizenship not at issue here, it is recognized that the purpose of the 2000 Act was "to liberalize then-existing law to make it *easier* for foreign-born children of United States citizens to obtain citizenship." *Pina v. Mukasey*, 542 F.3d 5, 8 (1st Cir. 2008) (emphasis added). It would therefore be strange if the 2000 Act simultaneously made it *harder* for children to become derivative citizens, as the majority opinion necessarily implies.

The better read of the 2000 amendments is that, like the 1940 and 1952 amendments, they were just another way to say the same thing: a child seeking derivative citizenship must show that he has lawful permission to reside permanently in the United States.

II

There remains one final set of problems for the majority. If "reside permanently" does not mean residing permanently in the United States under lawful status to do so, what does "reside permanently" mean? The majority tells us it means "that an applicant demonstrate an *official manifestation* of permanent residence." (Emphasis added). The majority then concludes that Cheneau meets this requirement because he "filed an application for adjustment of status to lawful permanent resident status after his mother naturalized" and before he turned 18, thus "expressing his intent to resident permanently in the United States." Unfortunately, many issues flow from the majority's decision to interpret the statute at odds with its text and historical roots.

The first, most obvious, is that if "reside permanently" does not mean "lawful permanent residence," then by its plain text it should just mean "reside permanently," full stop. But if that were the case, a minor could enter the United States unlawfully, remain here illegally, commit numerous deportable offenses, and yet achieve (and maintain) automatic citizenship. Or the minor could enter lawfully, stay unlawfully, and become a citizen that way. There is no basis to conclude Congress meant to confer citizenship on such persons, much less condone the unlawful conduct that would lead to it.

To avoid these untoward results, the majority is forced to place a new gloss on the statute, requiring a person "officially" to declare himself as "inten[ding] to reside permanently in the United States." It is not apparent that someone would need to be present in the United States legally to meet the majority's test. But even so, the statutory text

says nothing about "official manifestations" of permanent residency. The majority's self-created requirement exceeds an (incorrect) "strict construction" reading of "reside permanently"—measured by length of physical presence only. At the same time, it falls short of the restriction Congress actually imposed—a lawful permanent residency requirement.

The majority's only support for its middle-ground "official manifestation" approach is the Second Circuit's decision in *Nwozuzu v. Holder*, 726 F.3d 323, 333 (2d Cir. 2013), which adopted the same rule. But *Nwozuzu* purported to locate this rule in its prior decision in *Ashton v. Gonzales*, 431 F.3d 95, 98 (2d Cir. 2005). *See Nwozuzu*, 726 F3d. at 333. And *Ashton* cited no authority for its qualification, instead merely stating that the court "*believe[d]* that there must be some objective official manifestation of the child's permanent residence." *Ashton*, 431 F.3d at 98 (emphasis added). Such an atextual "belief" should not command our allegiance here.

But that is not the end of the difficulties. Presumably because the statutory language says "*thereafter begins* to reside permanently," the majority suggests it matters here that Cheneau made his "official manifestation" "after his mother naturalized." That would seemingly address my hypothetical of the child who is not a lawful permanent resident and who is therefore ineligible for derivative citizenship under § 1432(a)(5)'s first clause, but who wakes up the morning after his parent naturalizes and finds himself a United States citizen under the second clause. But even then, the child could later that day "officially" manifest his intent to reside permanently, which would apparently suffice under the majority opinion.

It is hard to see what sense there is in any of this. If Cheneau had applied for adjustment of status before his mother naturalized and not done anything after that time to further manifest his intent permanently to remain here, it appears that under the majority opinion he would not be a derivative U.S. citizen. But if he had consistently manifested that "official" intent before her naturalization, including for years, what difference should it make if he did nothing more afterwards? The majority's approach rewards people who "officially manifested" a permanent intent to remain in the United States toward the end of their minority, while placing at a comparative disadvantage those children who arrived here at a young age, resided here for many years, but failed to take any further "official" action after their parents naturalized and before they turned 18.

The arbitrariness that the majority's approach invites can be seen in *Thomas v. Lynch*, 828 F.3d 11 (1st Cir. 2016). There, the First Circuit declined to decide whether my view or the majority's view was correct, holding that even under the majority's view, the petitioner there could not prevail because he had taken "no official action with respect to his citizenship status *in the three-day window* between his mother's naturalization and his eighteenth birthday." *Id.* at 17 (emphasis added). That was so even though the petitioner, Thomas, had lived in the United States since he was five years old and even though his mother, before her naturalization, had made repeated immigration filings on Thomas's behalf, including seeking to have Thomas classified as a lawful permanent resident. *Id.* at 12–13. Cheneau, in comparison, did not arrive in the United States until he was 13 and his mother apparently allowed three years to pass before pressing the INS on the status of his

application for adjustment of status. Is Cheneau really more deserving of derivative citizenship than Thomas?

Congress could of course have decreed that a petitioner like Thomas should have done something "official" in the mere 72 hours between the happy occasion of his mother's naturalization and his turning 18. If that result were considered unjust, Congress could have changed the law. Or if Congress refused, we could at least have the satisfaction of knowing that such a rule, potentially harsh in some of its applications, was the product of a democratic process. The difficulty is that when courts depart from the statutory text and bear responsibility for a new legal regime, they must also face the valid criticism that the regime they have put into law may produce its own inequities.

Finally, we are left with the question of what counts as an "official manifestation of permanent residence." To my knowledge, that is not a concept with any understood meaning in immigration law. Before today, it was understood that "[a] child's acquisition of citizenship on a derivative basis occurs by operation of law and not by adjudication." *Matter of Fuentes*, 21 I. & N. Dec. 893, 896 (BIA 1997). That makes sense when the triggers for derivative citizenship are two legal events: a parent's naturalization and a child securing permission permanently to remain in the United States lawfully. But an "official manifestation" test almost by definition will require adjudications as courts sort through the limits of that concept.

Here the majority holds it is sufficient that Cheneau filed for adjustment of status to lawful permanent resident after his mother naturalized. But left unsaid is whether any manifestation short of that would also suffice. What about

the many other actions a non-citizen could take that might reasonably reflect an intent to remain in the United States permanently?  Knowing which actions are "official" enough or indicative enough of an intent to reside here permanently is hard to say after reading the majority's opinion.

The uncertainty that the majority opinion produces clashes with Congress's objective that derivative citizenship—a status conferred automatically when the required conditions are met—should be relatively easy to determine.  In the derivative citizenship context, "[t]he Congressional goal was to create a bright-line test so that those who fell without the derivative citizenship provision could recognize that fact."  *Peignand v. INS*, 440 F.2d 757, 759 (1st Cir. 1971); *see also Cheneau*, 971 F.3d at 968 ("The INA confers *automatic* derivative citizenship on the children of a naturalized citizen, provided certain statutorily prescribed conditions are met." (quotations omitted and emphasis added)).  Being able to assess with relative ease whether someone is a derivative citizen has obvious benefits for both the government and for those persons who may be derivative citizens, as well as their families.  An "official manifestation" test injects considerable ambiguity into that process, while expanding the population of derivative citizens beyond what Congress authorized.

The implications of today's decision are thus potentially significant.  While the statute we construe here is no longer operative, it was in place for a very long time and in the not-too-distant past.  Government statistics indicate that close to 11.5 million people naturalized between 1952 and 2000, which is the timeframe that former § 1432(a)(5) was in effect.  *See Naturalizations*, Department of Homeland Security, https://www.dhs.gov/immigration-statistics/naturalizations

(select "Naturalizations 2019 Data Tables" to download ZIP file and then select "fy2019_table20.xlsx" within ZIP file). The majority's interpretation of "reside permanently" would also presumably extend to the derivative citizenship statutes in place going back to 1907, and another 6.5 million people became naturalized citizens between 1907 and 1940. *See id.* If these many millions of persons who naturalized over this nearly 100-year period had children born abroad who came to the United States, those children (who are now adults) could turn out to be derivative U.S. citizens, perhaps without appreciating it.

This matters because derivative citizenship confers important benefits. And there may now be substantial questions about who is entitled to those benefits. Cheneau asks to not be removed from the United States, which is one very basic, though significant, benefit of citizenship. But there are many others, "including rights to vote in federal elections, to travel internationally with a U.S. passport, to convey citizenship to one's own children even if they are born abroad, to be eligible for citizen-only federal jobs, and, indeed, to be free of discrimination by Congress on the basis of alienage." *Xia v. Tillerson*, 865 F.3d 643, 650 (D.C. Cir. 2017). There are other benefits as well, such as being able to run for certain public offices, serve on federal juries, and access certain federal benefits. *See, e.g.*, U.S. Const. art. I, § 2, cl. 2; *id.* § 3, cl. 3; 28 U.S.C. § 1865(b)(1); 8 U.S.C. §§ 1612, 1613(a). The citizenship issue also arises in criminal law, such as in illegal re-entry prosecutions. *See Forey-Quintero*, 626 F.3d at 1324.

Courts, and the federal government more generally, may now need to determine whether someone has "officially manifested" enough intent to remain in the United States

permanently to qualify for the rights and benefits of citizenship. And that is to say nothing of persons who were previously denied these benefits because of their perceived lack of U.S. citizenship, such as persons who were removed from this country but who in fact were derivative citizens like Cheneau and may now claim they should be allowed to reenter.

That the majority's interpretation raises more questions than it answers is another sign that our Court's new interpretation is incorrect. I would have thus held, consistent with the statutory text, its history, and our prior precedent, that Cheneau is not a derivative citizen. I therefore respectfully dissent.